THE CITY OF CHESTER.

THOM et al. v. NORFOLK & C. R. CO.

(Circuit Court of Appeals, Fourth Circuit. February 2, 1897.)

No. 149.

1. COLLISION—IGNORING SIGNALS—EXCUSES.
   It is no excuse for failure to answer a signal that the vessel for which it was intended heard it, but did not understand that it was for her, other vessels being in the vicinity. It is her duty to understand and heed such signals, especially when the vessel giving them is on converging courses with her, on her starboard bow, and has the right of way.

2. SAME—DUTY TO AVOID DANGER.
   A vessel which fails to get an answer to her signals is not justified, though she have the right of way, in continuing onward until the danger point is reached. Her duty, especially in a crowded harbor, and when approaching a tug incumbered with a tow, is to take every care to avoid a course involving risk of collision.

3. SAME—TUG WITH STEAMER AND TOW—SIGNALS—MUTUAL FAULT.
   A steamboat with a tow projecting in front was proceeding up Norfolk Harbor, near the Norfolk side, and was under engagement, by signal, with a tug and tow coming down outside of her. Another tug, crossing from the Portsmouth side to reach a wharf, blew two signals of one blast each, which were heard by the steamboat, but not answered, because supposed to be for another vessel. The tug, nevertheless, continued her course, crossed in front of the descending tug, and struck the steamboat's tow. Held, that both steamboat and tug were in fault, the former for failing to understand and heed the signal, and the latter for proceeding after failing to get an answer.

Appeal from the District Court of the United States for the Eastern District of Virginia.

This was a libel in rem by the Norfolk & Carolina Railroad Company against the steamboat City of Chester (Alfred P. Thom, receiver of the Atlantic & Danville Railway Company, claimant), to recover damages resulting from a collision in Norfolk Harbor. The district court found that the City of Chester was alone in fault, and entered a decree for libelant. 68 Fed. 574. The claimant has appealed.

Richard Walke and Alfred P. Thom, for appellant.

Robert M. Hughes, of Sharp & Hughes, for appellee.

Before GOFF and SIMONTON, Circuit, Judges, and MORRIS, District Judge.

SIMONTON, Circuit Judge.   This case comes up by appeal from the district court of the United States for the Eastern district of Virginia, sitting in admiralty.   It is a case of collision, occurring in the harbor of Norfolk, between the Pinner's Point, a steam tug of the Norfolk & Carolina Railroad Company, and the steam tug City of Chester.   The collision took place at 8 a. m., on a clear and bright day.   The City of Chester had in tow on her port side a large barge, loaded with railroad cars, which projected 40 feet beyond her bow.   She was proceeding south, up the harbor.   The Pinner's Point, without any tow, had left Trugien's Wharf, on the Portsmouth side of the harbor, and was making across the harbor, and across the course of the City of Chester, for the wharf of the Norfolk & Carolina Railroad Company, on the Norfolk side of the harbor.   At the same time the steam tug Martha Helen was proceeding north, down the harbor, with two brigs in tow astern on a hawser, the tow being in all 400 feet long.   The Pinner's Point had gone into the stream, and, when she was abreast of the Ferry Slip on the Norfolk side of the harbor, she straightened on her course for the Norfolk & Carolina Railroad wharf.   To the north of this wharf are the wharves of the Bay Line steamers and of the Boston steamers.   To the south of it are the wharves of the Compress Company, of the Norfolk & Southern Company, of Jones, of Lee, and of Campbell; and next to Campbell's wharf, south, is the Ferry Slip.   The Pinner's Point was abreast of the Ferry Slip, and the Martha Helen had not quite reached it.   The City of Chester was then abreast of the wharf of the Bay Line steamers.   The distance between the Ferry Slip and the wharf of the Bay Line steamers is 2,250 feet, or 750 yards.   So this was the distance between the City of Chester and the Martha Helen.   The Pinner's Point was about the same distance from the City of Chester, and was four or five points off her starboard bow.   The Martha Helen approaching the City of Chester had signaled her with two whistles, indicating that she would put her helm to starboard.   The City of Chester had replied with two whistles accepting the signal.   After this, when the Pinner's Point was in the position, and at the distance above stated, she blew one whistle to the City of Chester.   This signal was not answered by the latter vessel, as she did not recognize that it was intended for her, but supposed it was for one of two steam vessels coming up astern of her.   The Pinner's Point then blew a second signal of one whistle, with the same result.   The Pinner's Point, no answer having been received to either signal, went on, passed in front of the Martha Helen, and blew another signal of one blast, which was responded to with one blast by the City of Chester.   The latter then ported, and reversed her engines, but too late to avoid a collision.   The Pinner's Point collided with the barge which was on the port side of the City of Chester, overlapping her bow some

40 feet, striking the barge on the port bow, at her own forward port bitts. The course of the City of Chester was 40 or 50 yards distant from the Norfolk line of wharves. The Martha Helen was on a course about parallel to hers, somewhat further off, about 125 yards out from the line of the wharves. The course of the Pinner's Point crossed the courses of both the other tugs. To recapitulate a little: The Pinner's Point being distant from the City of Chester, on her starboard bow, about 750 yards, blew one blast to her, and got no answer, and blew another, with the same result. She kept right on across the bow of the Martha Helen, blew another blast to the City of Chester, and in a moment came in collision with her, the Martha Helen's bow being then off the City of Chester's stern.

The district court held that the Pinner's Point had the right of way, and that it was the duty of the City of Chester, having the Pinner's Point on her starboard side, to keep out of her way; that not having done so, she violated old rule 19 (new 16), and is solely liable for the collision. We are of opinion that this is too harsh a judgment of the City of Chester. In the first place, she was incumbered with a heavy tow, and her movements more or less hampered. She was under engagement by exchange of signals with the Martha Helen to starboard her helm before the first signal from the Pinner's Point. She was 40 or 50 yards from the line of wharves on her port side, and had the Martha Helen a point and a half on her starboard bow, approaching on a line parallel to her course, the courses of the two being at a distance of 50 to 75 yards from each other. She could not, under these circumstances, have assented to the one blast of the Pinner's Point. If she had done so, she would have broken her engagement with the Martha Helen, and, by porting instead of starboarding her helm, would have run serious risk of collision with her. She did commit a grave fault in not responding to either the first or second signals of the Pinner's Point, and thus advising the Pinner's Point of her dilemma. She thus contributed to the accident. The Lowell M. Palmer, 58 Fed. 701; The New York, 53 Fed. 555. It is no excuse to say that she heard the signal, but did not understand that it was for her. It was the duty of the City of Chester to understand and heed the signal; especially was this the case as she knew that the Pinner's Point was off her starboard bow on a converging course with hers, and, under ordinary circumstances, entitled to the right of way. The Great Republic, 23 Wall. 31.

But the Pinner's Point was not free from fault. The paramount duty of every vessel in proximity to another vessel is to avoid the risk of collision, and to take every precaution to this end; and in harbors this duty is intensified, the utmost care and vigilance being imperatively required from all vessels. The rules of navigation are prescribed for the purpose of governing the action of approaching vessels in all ordinary cases. But notwithstanding the minute provisions of these rules, in construing and obeying them, due re-

gard must be had to all dangers of navigation, and to any special circumstances existing in any particular case, which may render a departure from them necessary in order to avoid immediate danger. Rule 24; The America, 92 U. S. 432. In the present case the Pinner's Point, under rule 19 (now 16), had the right of way, and under normal circumstances should have proceeded on her course. But this did not free her from obligation to take every care, and so to conduct herself as to avoid a course involving risk of collision. Even the fault of the other vessel could not free her from this. The Maria Martin, 12 Wall. 47.

In The Catskill, 38 Fed. 367, a collision had occurred between the steamer Catskill and a ferryboat, the Baltimore, the latter having the right of way. The Baltimore signaled the Catskill, and got no response. Nevertheless, she kept on her course, and did not stop and reverse until she was within 200 yards of the Catskill. See same case, 34 Fed. 660. The court, affirming Judge Brown, says:

"Under such a state of facts, the Baltimore is clearly in fault. Her navigator was not surprised by any sudden indication that another craft, which he supposed intended to obey the rules, meant to violate them. On the contrary, with a very plain intimation that the other vessel was willfully or needlessly continuing on a course which made collision imminent, he kept on in the hope that at the last moment she would discover her error, and seek to rectify it. For thus keeping on until the safety limit was reached and passed, the district judge held the navigator of the Baltimore in fault, and his decision is affirmed."

In The Non Pareille, 33 Fed. 524, Brown, J., says:

"There is no such thing as a right of way to run into unnecessary collision. The rules of navigation are for the purpose of avoiding collision, not to justify either vessel incurring a collision unnecessarily. The supreme duty is to keep out of collision. The duties of each vessel are defined with reference to that object, and, in the presence of immediate danger, both, under rule 24, are bound to give way, and to depart from the usual rule, when adherence to that rule would inevitably bring on collision, which a departure from the rules would plainly avoid."

See, also, The Sunnyside, 91 U. S. 222, 223.

So, in The Aurania, 29 Fed., at page 123, the court quotes as follows:

"Risk of collision means not merely certainty of collision if no efforts be made to avert it, but danger of collision; and there is danger or risk of collision when it is clearly not safe to go on. The John McIntyre, 9 Prob. Div. 135. The distinction between the risk and the certainty of collision is fully commented on by Brett, L. J., in The Beryl, Id. 137, where it was held that the rules required effort to avoid not merely the certainty of a collision, but the risk of it, and that the obligation of the vessel that had the right of way to slacken or stop in order to avoid collision arose with the risk of collision, and not merely when it would otherwise be certain."

See, also, The Khedive, 5 App. Cas. 876.

In The E. A. Packer, 140 U. S. 369, 11 Sup. Ct. 794, a ruling by the house of lords in The Memnon, 62 Law T. (N. S.) 84, 6 Asp. 488, was approved, wherein it was declared that it is the duty of the vessel entitled to keep her course to comply with the rule as to slackening speed, or stopping and reversing, if necessary, and, if she fail to do so, the burden is on her to show that to continue her speed was the best and most seamanlike maneuver.

Apply these principles to the case at bar. · The Pinner's Point saw the City of Chester with her tow, and the Martha Helen with her tow, approaching each other on parallel courses. They were between her and the wharf to which she wanted to go. Her movements in the harbor were unobstructed. She was approaching the course of a tug incumbered with a tow, and should have taken her incumbered condition into consideration. Mars. Mar. Coll. 378, and cases quoted. She blew her first blast to the City of Chester, got no response; blew again, with like result. This should have put her on her guard, and have indicated that something was out of the usual course,—something which required explanation. She should have obeyed the requirement of the third pilot rule:

"Rule 3. If, when steamers are approaching each other, the pilot of either vessel fails to understand the course or intention of the other, whether from signals being given or answered erroneously, or from other causes, the pilot so in doubt shall immediately signify the same by giving several short and rapid blasts of the steam-whistle; and if the vessels shall have approached within half a mile of each other, both shall be immediately slowed to a speed barely sufficient for steerage-way until the proper signals are given, answered, and understood, or until the vessels shall have passed each other."

Instead of doing this, the Pinner's Point went on her course, perhaps reducing speed a little, and, getting near to these two approaching steamers, put on full speed. She just cleared the Martha Helen, blew another blast when certainly not more than 75 yards from the City of Chester, and collided with her; she by that time having gotten abreast of the Martha Helen.

It would appear that the protest of the acting master of the Pinner's Point, made a few days after the collision, indicated the situation which the neglect of the foregoing rule by the Pinner's Point, and her stubborn adherence to her right of way without an exchange of signals, had produced, when he declares that "the Pinner's Point increased her speed when near the City of Chester on the one hand, and the Martha Helen, on the other, to prevent being jammed between those vessels."

We are of the opinion that the fault was mutual, and that the damages should be divided. The decree complained of will be reversed, and the case remanded, with directions that a decree be entered as herein indicated.