### THE SOUTHERN.

#### (District Court, D. Maryland. June 7, 1915.)

1. COLLISION ⬯38—VESSELS CROSSING—DUTY OF PRIVILEGED VESSEL.

So long as there is a chance that the burdened vessel will conform with rules in time to escape a collision, it is the duty of the privileged vessel to keep its course and speed whenever, by any possibility, a change from either might contribute to a collision; but no privilege exempts a vessel from using ordinary common sense to escape from danger.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 37, 38; Dec. Dig. ⬯38.]

2. COLLISION ⬯95—STEAM VESSELS CROSSING—CHANGE OF COURSE BY PRIVILEGED VESSEL.

A collision in Baltimore harbor between a scow in tow and a crossing power launch on the starboard side of the tow *held* due to the fault of the launch, which changed its course to starboard and was from 200 to 300 feet from its proper and direct course at the time of collision, and which also could have stopped, when collision became imminent, in time to avoid it. The tug *held* not in fault for violation of the starboard hand rule, because the launch, when seen, was on a course which would have taken it safely under the stern of the tow.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200–202; Dec. Dig. ⬯95.]

In Admiralty. Petition by the Chesapeake Steamship Company of Baltimore City, as owner of the steam tug Southern, for limitation of liability. On hearing on question of liability for collision. Decree for petitioner.

Arthur D. Foster and John Henry Skeen, both of Baltimore, Md., for petitioner.

Isaac Lobe Straus, Joshua Horner, Jr., and Robert Phillips, all of Baltimore, Md., for claimants.

ROSE, District Judge. On the morning of January 15, 1915, there was a collision in the harbor of Baltimore between scow No. 8, then in tow of the tug Southern, and the launch Leader. The last was capsized and damaged. One of the three persons on board of it was drowned. The other two were thrown into the water. They say they were seriously hurt. The tug belongs to the Chesapeake Steamship Company. The latter was sued in one of the state courts for the death of the man who lost his life and for the injuries suffered by the others; $90,000 in the aggregate is claimed in the various suits brought against it. While asserting that the tug was in no wise to blame, it has asked this court to limit its liability to $4,700, the sum at which in these proceedings the tug and tow have been appraised.

Was the tug in fault? is the question now to be passed upon. At the time of the collision the launch was bound from Pier 6 on the Canton side of the harbor to Curtis Bay; the tug and tow, from Pier 2 on that side to Pier 31–32 on the Locust Point side. These courses were very nearly at right angles to each other. The launch was to the starboard of the tug and its tow, and, to the extent to which the starboard hand rule applied, they were the burdened vessels; it, the privileged.

The master of the launch says that he blew a one-blast signal on a mouth whistle. In the position in which the boats then were, this meant that he elected to cross the bows of the tug and tow. He never heard any signals of any kind from the tug or its tow. They kept silently moving across his path until the risk of collision became imminent, and then, and only then, he changed his course to starboard in an attempt to escape. He says that the bow end of the scow struck the port side of the stem of the launch. The story of the captain of the tug is that the launch, when he first noticed it, was on a course which would have carried it safely under his stern. He blew a two-blast signal. He had no response, but at that time the launch changed its course to starboard. He at once blew the danger signal and ordered his engines full speed astern. The launch, however, continued to go more and more to starboard, and, although he brought his tug and tow almost, if not quite, to a standstill, the launch struck the scow on the port side near its forward end. Each in the pleadings charges that the other did not keep a proper lookout, did not respond to signals, and violated inland pilot rule 1. Moreover, the tug says that the navigator of the launch was incompetent, and was blameworthy in trying to cross the bows of the tug and tow. The launch alleges that the tug violated rules 2, 7, and 9.

In order to pass intelligently upon the merits of these mutual charges, it is necessary to consider the limits of time and space within which all the material acts of omission or commission happened, and especially to fix, at least approximately, the point at which the collision took place.

In so far as the tug is concerned, upon the evidence there is no room for controversy as to what she did, although there is a question as to when she did it. Her course was about west by north and was never altered. The boats, therefore, came together somewhere on the direct line between Pier 2 and Pier 32. Only one witness appears to have been asked how far, at the time of the collision, the tug was from the outer end of Pier 2. He was a disinterested and experienced master mariner, thoroughly familiar with the harbor. At the time of the collision he was at Pier 2. He says that the boats came together about 1,000 feet away from it. Such estimates of distances on the water, even when made by competent and experienced men, are extremely likely to be incorrect, as is strikingly illustrated by the testimony given in this case by the captain of the tug. Nevertheless, all the other circumstances, and in my view all the other testimony, except that now given by the master of the launch, tends to show that the estimate of 1,000 feet was not far out of the way. The United States coast guard steamer Guthrie was at the time lying about midstream. Some of the witnesses think it was somewhat nearer the Canton shore;

others, the Locust Point. The distance between the pier head lines on the Canton and Locust Point sides may be taken roughly at 2,500 feet. The witnesses say that at the time of the collision the Guthrie was 300 to 500 feet away from the point at which the boats came together, and to the northward of them. These locations tend strongly to confirm the estimate that at the time of the collision the tug was at least 800 or 900 feet from the end of Pier 2.

How did the launch get there? The extreme northern corner of Pier 6 is distant northerly only 600 feet from the prolongation of the southern side of Pier 2. Pier 6 extends to the pier head line. Pier 2 is not so long, and stops about 165 feet short of that line. The most direct route of the launch to its destination would have been just outside of the pier head line. So moving, it would have crossed the course of the tug somewhere from 175 to 250 feet from the end of Pier 2. If it had done so, it would have passed safely under the stern of the tug and tow. Its master says that he was steering for the lower end of Ft. McHenry, so as to get out beyond the channel. The point of land upon which the fort stands so narrows the harbor mouth that no straight course from Pier 6 to pass it can be laid which will cross the path of the tug further than 375 feet from the pier head line, or 540 feet from the outer end of Pier 2. If the collision took place from 800 to 1,000 feet from the pier, the launch must have gone from 260 to 460 feet to the starboard of any course it had occasion to be on.

The captain of the tug insists that the launch did go to starboard, and kept going more and more in that direction, and, had it not done so, there would have been no trouble of any kind. While listening to him testify, I was impressed with the conviction that, whether he was right in this respect or not, he believed that he was. The navigator of the launch testified that he kept his original course until the very second before the collision, when, in a last despairing effort to escape the impending catastrophe, he tried to go to starboard, but had not moved more than five feet in that direction when the crash came. A few days after the accident he testified concerning it before the steamboat inspectors. He then said he went as much as 150 feet to starboard. If the collision took place, as I believe it did, not less than 750 or 800 feet from Pier 2, this statement of his deflection to starboard was an under rather than an over estimate.

Why did he thus unnecessarily run into danger? He was a boiler cleaner by trade. That did not give him steady occupation. For some 7 or 8 years he had off and on in those intervals, when he could not get employment at it, worked for an owner of launches. Some 4½ months before the collision he had obtained a license to run a motor boat. No examination is necessarily required for such a license. How far he knew the rules of navigation and understood the meaning of the various signals prescribed by them is not clear. Very probably he could pass a theoretical examination in them. Whether his knowledge of them had become so far instinctive that he could surely rely upon it in times of danger, when it was necessary both to think and to act quickly, is very doubtful. His testimony in other respects than as to the distance which he went to starboard is hardly reconcilable with the established facts. He said he sounded one blast on a mouth whistle

when he was within a very few hundred feet of the tug. When he blew this whistle he had his head out of the open forward window of the launch. No one not in the launch heard this signal, although he says that the wind was blowing, though lightly, from the launch to the tug. If he blew his whistle while in the position he says he was, it would almost certainly have been heard by others, unless, indeed, he sounded it at the very moment one of the much more powerful blasts were blown from the tug or from the Guthrie. But, had such signals been given when he was leaning out of his window looking at the tug, it is hard to understand how he could have failed to hear what was readily heard by other people in a number of different directions, some of them further from the tug than he was. The testimony of Cohen, his surviving passsenger, suggests a possible explanation. This last-mentioned witness was so shaken by the death of his son, and by his own immersion and narrow escape from drowning, that he does not attempt to recall many, or indeed any, details of what took place. He remembers the sounding of a whistle on the launch. His head was down at the time, and he did not see where the navigator of the launch was then standing. His present recollection is that the whistle appeared to come from the neighborhood of the engine of the launch, which was some five feet abaft the wheel.

The most probable explanation of what took place on the launch is that its navigator was for some reason busying himself with its engine when he was needed at its wheel and on the lookout. His fault and that of the launch was clear enough. If he was relying on the starboard hand rule, it was his duty to keep his course and speed until for to do so involved inevitable disaster, unless, of course, he had otherwise agreed with the burdened vessel, as he says he had not. If he had held his course, there would have been no collision. Whether the launch struck the scow, or the scow the launch, is in dispute. At all events, their stems came together. The scow was not over 85 feet long. If the launch had held its course, instead of being 200 or 300 feet to the starboard of it, the collision could scarcely have taken place.

It would have been unnecessary to have gone into all these details, if the only purpose had been to ascertain whether the launch was in fault. It could stop within from 30 to 50 feet. The circumstances would be very unusual under which it could be held free from blame in colliding on crossing courses with a tug and tow, which from the stem of the tug to the stern of the tow extended about 100 feet, and which never changed their course.

[1] It is true that so long as there is a chance that the burdened vessel will, after all, conform to the rules in time to escape a collision, it is the duty of the privileged to keep its course and maintain its speed, whenever by any possibility a change of either might conceivably contribute to a collision. The Chicago, 125 Fed. 712, 60 C. C. A. 480; The Cygnus, 142 Fed. 85, 73 C. C. A. 309; The Deveaux Powell, 165 Fed. 634, 92 C. C. A. 54.

[2] In the case at bar the danger of collision had become imminent before the launch came within 50 feet of the scow. It was not then possible for the tug to do anything to keep the boats from coming together. It was still in the power of the launch to stop. Such stopping

would not have done any harm, no matter what the tug and its tow thereafter might do or attempt. No privilege exempts a vessel from using ordinary common sense to escape from danger. The New York, 175 U. S. 187, 20 Sup. Ct. 67, 44 L. Ed. 126; The City of Chester, 78 Fed. 186, 24 C. C. A. 51.

Most of the parties to this litigation are interested in the conduct of the launch only in so far as it throws light upon the question of the liability of the tug, which is to them the one practically important issue. The launch in its damaged condition is of little value. Its negligence could not be imputed to the deceased passenger on it. It is highly probable that the pecuniary value of his life to his widow would fully equal the sum at which the tug and scow had been appraised. To her and to her father-in-law, who is suing for his own injuries, as well as to the owners of the tow and tug, it makes very little difference whether the launch was or was not in fault. What interests them is: Was the tug also to blame?

The contention that the scow so obstructed the view of the navigator of the tug that he could not see the launch is not sustained by the evidence, nor was the tug guilty of violating rule 2 by crossing signals. If the whistle of the launch was ever sounded, it was not heard by any one not on the launch itself. If the tug is blameworthy, it is for her failure to observe the starboard hand rule; and this inquiry can itself be still further narrowed. Many of the questions asked the master of the tug on cross-examination were in effect criticisms of his failure to direct his course so as to pass under the stern of the launch. The tug and the launch were never more than 600 feet apart, and by the time there would have been any reason to attempt such a maneuver they were much closer. If the launch had held its course, it would have crossed that of the tug, as already pointed out, not more than 375 feet west of the pier head line. That crossing would have taken place in about a minute and a quarter after the launch started from Pier 6, for its speed was about 5 miles an hour and the distance 600 feet. To have turned the tug and tow in those narrow limits of time and space, so as to pass under the stern of the launch, would have exposed the launch to a peril from which even prudent navigation on its part might not have enabled it to escape. The captain of the tug rightly said that he had not room to go under the stern of the launch. It is true that, like many other practical men, he found it difficult to explain in words what to him was so plain that he could not conceive how any explanation could make it clearer.

In the last analysis, if the tug is to blame at all, it is for not sooner stopping and reversing. It must be admitted that the tug in this respect may all the more readily have offended against the starboard hand rule, because it is certain that its captain never gave thought to that rule, or for a single moment supposed that it had any relation to his navigation with reference to that of the launch. It seemed to him so simple a matter for the 21-foot launch to keep out of his way, and so much more difficult for his tug and tow to get out of its, that it obviously never entered his head that he was navigating a burdened vessel. Nevertheless, a power boat, however small, is a steam vessel

within the meaning of the starboard hand rule. The Nimrod (D. C.) 173 Fed. 520.

His failure to appreciate that the rule was applicable may, if he in fact broke it, go far to explain why so experienced a mariner violated it; but it will not make the tug liable unless what he in fact did was forbidden by it. He says that when he first saw the launch it was on a course which, if held by it, would have carried it safely under his stern. Under such circumstances he was entitled to proceed. He was not bound to anticipate an unreasonable change of course on its part. The Wm. E. Gladwish, 206 Fed. 901, 124 C. C. A. 561.

If the launch had continued to head as he says it was at first headed, any attempt by him to stop and reverse would have made collision probable, if not certain. But if, the circumstances being such as they were, he was under no obligation to do anything until the change of course upon the part of the launch manifested itself, his improper delay, if any there was, comes down to a matter of seconds. He did stop and reverse, or tried to, before the collision, but very little before. He sounded the danger signal and stopped and reversed. Now, the sounding of the danger signal was so nearly simultaneous with the collision that the deck officer of the Guthrie thought he saw the boats come together before he heard the blasts. The tug had previously given a two-blast signal intended for the launch. According to the present recollection of the master of the tug, this signal was sounded before he noticed any change of course on the part of the launch. The Guthrie thought the signal was intended for it, and replied with two blasts.

As already stated, the master of the launch says he heard none of these whistles. As he claims that he made no change of course until a second or less before the collision, those who rely upon his testimony naturally do not question that the two-blast signal from the tug preceded that change of course.

As I have reached the conclusion that the launch at the time of the collision was from 200 to 300 feet off its course, it may be interesting to inquire whether this departure began before or after the tug gave its first signal. To have gotten so far to the westward as the launch had would have taken an appreciable, although, of course, a small, amount of time—perhaps in the neighborhood of a half to three-quarters of a minute. The collision was almost simultaneous with the sounding of the signal. That signal followed immediately upon the two-blast signal from the Guthrie, which was promptly sounded in reply to the like signal from the tug. All this may have taken as much as half a minute, or even more; possibly it may have taken a few seconds less. No one can be certain about it. It is possible that the tug's captain did not signal the launch at all until he thought he saw a change in its course, and that he then gave the signal to call the attention of those in charge of the launch to the fact that he intended to cross its bow. I should hesitate to hold the tug liable on a guess that such was the case.

Moreover, even if the fact were certain, would the tug necessarily be in fault? There was no danger until the launch, privileged vessel as it was, without reason changed its course when within 300 feet or

thereabouts of the tug. This change had no apparent purpose. The captain of the tug may well have wondered whether it was not merely one of those erratic movements in which small and recklessly steered craft of the kind so frequently indulge. It might be that a second later the launch would return to its original heading. If it did, his stopping and backing might cause the very collision he wished to avoid. The change of the launch's course produced an embarrassing and perplexing situation, which might well make the master of the tug hesitate as to what it was best to do. As the launch had, or with reasonable care on the part of its navigator would have had, perfect control of its movements, and was still far enough off to enable it to escape the tug and its tow, if it knew precisely what the tug proposed to do, and as the movements of the tug could be more accurately estimated if it continued on its course than was possible while it was trying to stop and back, it was not unnatural for its master to think that the safest thing he could do was to keep going ahead, and by blowing two blasts tell the launch that he intended so to do. Of course, if he blew the two-blast signal before the launch changed her course, he has done nothing which it is necessary to defend; but even if the signal was not sounded until the change of course had begun, and he was in error in thinking and acting as he did, it was a mistake occasioned by the wrongful act of the launch in altering its course, and was an error for which the tug under the circumstances should not be held responsible. Of course, after the two-blast signal had once been given, the tug could not stop or back until it was certain that the launch did not respond to it; for, if the launch did comply with the tug's request and go to port, the tug's stopping and backing would almost certainly have caused a collision.

The fault of the launch is clear and manifest. It was the primary cause of the collision. The burden of proof rests upon those who contend that fault on the part of the tug also contributed to the disaster. That burden has not been sustained. It follows that the tug and scow must be held free from blame.

A decree in accordance with these conclusions may be presented for signature.