## THE SOUTHERN

## THE NO. 8.

(Circuit Court of Appeals, Fourth Circuit.  July 6, 1916.)

No. 1427.

COLLISION ⚙═95(5)—STEAM VESSELS CROSSING—CHANGE OF COURSE BY PRIVI-
LEGED VESSEL.

A collision in Baltimore harbor between a scow in tow and a launch
on crossing courses, such as to give the launch the right of way under
the starboard hand rule, *held* due solely to the fault of the launch, on
evidence warranting a finding that she kept going to starboard of her
original course, that the place of collision was several hundred feet from
such course, that if she had kept such course she would have passed
safely astern of the tow, and that after leaving their piers the tug and
tow were so near the course of the launch as to make it unsafe to at-
tempt to observe the starboard hand rule.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200–202; Dec.
Dig. ⚙═95(5).]

Appeal from the District Court of the United States for the Dis-
trict of Maryland, at Baltimore; John C. Rose, Judge.

Petition in admiralty by the Chesapeake Steamship Company of
Baltimore City, as owner of the steam tug Southern and scow No. 8,
for limitation of liability.  From a decree holding petitioner not lia-
ble for collision, Max A. Cohen, Joseph P. Harris, and the State of
Maryland, to the use of Frances Cohen, widow of Phineas Cohen,
damage claimants, appeal.  Affirmed.

For opinion below, see 224 Fed. 210.

Isaac L. Straus and Joshua Horner, Jr., both of Baltimore, Md.
(Robert Phillips, of Baltimore, Md., on the brief), for appellants.

Arthur D. Foster, of Baltimore, Md. (John Henry Skeen, of Balti-
more, Md., on the brief), for appellees.

Before KNAPP and WOODS, Circuit Judges, and JOHNSON,
District Judge.

JOHNSON, District Judge.  The state of Maryland, to the use
of Frances Cohen, widow of Phineas Cohen, began suit in the superior
court of Baltimore city against the Chesapeake Steamship Company,
claiming damages in the sum of $50,000 for the death of one Phineas
Cohen.  At the same time suit was begun in the superior court of Bal-
timore city by Max A. Cohen against the same defendant for personal
injuries in the sum of $20,000.  Also suit was begun in the superior
court of Baltimore city by Joseph Harris against the Chesapeake
Steamship Company for the sum of $20,000 for alleged personal in-
juries.  All these suits were for injuries alleged to have been caused
by defendant's negligence in navigating a tug and scow.

The Chesapeake Steamship Company filed its petition in the Dis-
trict Court of the United States for the District of Maryland, setting
forth the facts relating to the collision out of which the aforesaid suits
arose, and asking that it be exonerated, or, failing in that, its liability

be limited to the value of its tug and scow, as provided in sections 4282 to 4289 of the Revised Statutes of the United States (Comp. St. 1913, §§ 8020, 8027). The District Court appointed a board of appraisers, and the property of the defendant involved in the collision was valued at $4,700. This return of the appraisers was approved by the court. The aforementioned suits were all transferred to the United States District Court of Maryland as a court of admiralty. The several causes were tried together and resulted in favor of the steamship company. Whereupon it was ordered that the Chesapeake Steamship Company was entitled to exemption from all liability, and all parties, their agents, servants, proctors, and attorneys, were enjoined from the institution of any and all suits against the said Chesapeake Steamship Company, or its tug Southern, or its scow No. 8. From this decree the appellants seek relief.

The facts are that on January 15, 1915, there was a collision in Baltimore harbor between scow No. 8, then in tow of the tug Southern, and the launch Leader. The Leader was capsized and damaged. One of its passengers was drowned, and the other two were thrown into the water, and claim that they were seriously injured. The tug belonged to the Chesapeake Steamship Company. This company was sued in the courts of the state of Maryland for damages aggregating the sum of $90,000 on account of the collision referred to. The Chesapeake Steamship Company, affirming that its tug was in no wise to blame, asked the court either to exonerate it or to limit its liability to the value of the tug and scow. The real question in the case is whether or not the tug was in fault. The launch was bound from Pier 6 on the Canton side of the harbor to Curtis Bay; the tug and scow from Pier 2 on the Canton side to Pier 31–32 on the Locust Point side. These courses were very nearly at right angles. The launch was to the starboard of the tug and its tow, and to the extent to which rule 7 applies they were the burdened vessels, and the launch was the privileged one. The master of the launch claims that he blew a one-blast signal on a mouth whistle, which meant that he elected to cross the bows of the tug and scow; he claims that they kept silently moving across his path until the risk of collision became imminent, and then and then only he changed his course to starboard in the attempt to escape. He claims that the bow end of the scow struck the port side of the stem of the launch. The captain of the tug claims that the launch when he first noticed it was on a course which would have carried it safely under his stern, that he blew a two-blast signal, to which there was no response, but that the launch changed its course to starboard. He then blew the danger signal, and ordered his engines full speed astern. The launch, however, continued to go more and more to starboard, and although he brought the tug and scow almost, if not quite, to a standstill, the launch struck the scow on the starboard side, near its forward end.

Each party claims that the other did not keep a proper lookout, did not respond to signals, and violated inland pilot rule No. 1. The tug says that the navigator of the launch was incompetent and blameworthy in trying to cross the bows of the tug and scow. The launch

alleges that the tug violated rules 2, 7, and 9. The course of the tug was west by north and was never altered. The boats must have come together somewhere on a direct line between Pier 2 and Pier 32. One witness testifies that collision occurred when the tug was about 1,000 feet from the outer end of the pier. The District Judge says that all the circumstances tend to show that the estimate of 1,000 feet from Pier 2 is not far out of the way. If this collision occurred 800 or 900 feet from the end of Pier 2, the question arises: How did the launch get to that point? The extreme northern corner of Pier 6 is distant only 600 feet from the southern side of Pier 2. Pier 6 extends to the pier head line. Pier 2 is not so long, and stops about 165 feet short of that line. The most direct route of the launch to its destination would have been just outside of the pier head line. If it had taken this course, it would have crossed the course of the tug somewhere from 175 to 200 feet from the end of Pier 2 and would have passed safely under the stern of the tug and scow. The master of the launch says that he was steering for the lower end of Ft. McHenry, so as to get out beyond the channel. At the point of the fort the harbor mouth is so narrow that no straight course from Pier 6 to pass it can be laid which will cross the path of the tug further than 375 feet from the pier head line, or 540 feet from the harbor end of the pier. It follows, therefore, that if the collision took place 800 to 1,000 feet from the pier, the launch must have gone from 260 to 460 feet to the starboard of any course it had occasion to be on. The captain of the tug insists that the launch did go to the starboard, and kept going more and more in that direction, and that, had it not done so, there would have been no trouble of any kind. The master of the launch, shortly after the accident, testified before the steamboat inspectors. He then said he went as much as 150 feet to starboard, and if the collision took place not less than 750 or 800 feet from Pier 2, his statement of his deflection at that time was rather under than over the estimate.

Why did he thus unnecessarily run into danger? He claims to have blown a one-blast on a mouth whistle, which was not heard by any other person except those on the launch. The District Judge believes that the navigator of the launch was giving his attention to his engine when he ought to have been at the wheel and on the lookout. There is not any doubt about the fault of the navigator of the launch. His very great carelessness stands out clearly. If he was relying on the starboard hand rule, it was his duty to keep his course and speed until further to do so involved inevitable disaster, unless he had otherwise agreed with the burdened vessel, which he says he had not. It is clear that, if he had held his course, there would have been no collision; the launch would have passed a considerable distance under the stern of the tug and scow. Of course, the launch could stop within a few feet. The very great carelessness of the launch would not exonerate the tug and scow from liability, unless they were wholly free from any negligence that produced or might have produced the collision. If the tug is chargeable with any negligence, it is on account of her failure to observe the starboard hand rule. The launch,

however small, is a steam vessel within the meaning of the law. It was under rule 7 the privileged vessel. The rules of navigation are made to prevent collisions. Navigators must direct their vessels in accordance with these rules, unless the circumstances are such that to do so would invite disaster. Then the navigators must exercise their common sense and prudence.

The District Judge found that the tug and scow could not have turned so as to pass under the stern of the launch without exposing the launch to very great peril, from which even a prudent navigator might not have been able to escape. The tug had no room to go under the stern of the launch. The captain of the tug, being a man of 45 years' experience, exercised his common sense and his knowledge as a mariner so as to prevent collision, and but for the extreme carelessness of the navigator of the launch there would have been no collision. The District Judge believes that any attempt on the part of the tug to stop or reverse would have made collision almost certain if the launch continued its course. It seems that, as soon as the captain of the tug saw that the launch had changed its course and kept changing it, he stopped and reversed, or tried to do so. The District Judge, from all the evidence, reached the conclusion that the tug and scow were entirely without fault and that the launch was wholly responsible for the collision.

The only question in this case that there could be any doubt about is as to whether or not the captain of the tug, under all of the circumstances fairly interpreted, recognized and followed the starboard hand rule. After a careful reading of the testimony, this court is satisfied that the findings of the District Court are abundantly sustained by the evidence, and for that reason the decree below is affirmed.