## THE NORFOLK.

(District Court, D. Maryland. March 14, 1924.)

1. **Collision ⬛⇒95(2)—Ferryboat held in fault for collision with a crossing steamship.**

   A tug, towing a lighter as a ferryboat, which, on the approach of a steamer on her starboard side on a crossing course, signaled her desire to cross ahead and without receiving any answer continued her course and speed until too late to avoid collision, *held* chargeable with gross fault.

2. **Collision ⬛⇒76—Signal agreement alone can justify departure from navigation rules.**

   To justify one vessel in a departure from the navigation rules, the positive assent of the other vessel by signal agreement is always necessary.

3. **Collision ⬛⇒77—Failure to keep careful lookout held not contributing cause of collision.**

   Failure of a steamship to keep a careful lookout, or to hear and answer signals from a vessel on a crossing course, *held* not a contributing cause to a collision between them, where she was the privileged vessel and required by the rules, in the absence of agreement to the contrary, to keep her course and speed, which she did.

4. **Collision ⬛⇒76—Cross-signal in answer to one proposing a departure from the rules held not violation of pilot rule.**

   A harbor pilot rule forbidding the giving of cross-signals applies only where the vessel giving the first signal indicates a course or maneuver authorized or required by the navigation rules, and is not violated by a cross-signal where the first signal proposes a departure from the rules.

5. **Collision ⬛⇒38—Nature of duty of privileged of crossing vessels to maintain her course and speed, stated.**

   The duty of the privileged of two crossing vessels to keep her course and speed is as definite and precise as the duty of the burdened vessel to keep out of the way.

6. **Collision ⬛⇒38—Privileged vessel not required to abandon maneuver to permit other vessel to cross ahead.**

   Where the privileged of two crossing vessels was moving under a port helm, she was under no obligation to abandon the maneuver and take a straight course to permit the other vessel to cross ahead.

7. **Collision ⬛⇒39—Failure of privileged vessel to maintain speed held fault contributing to collision.**

   Failure of the privileged of two crossing vessels to maintain her speed *held* not justified by the situation, but to constitute a fault contributing to collision between them.

8. **Collision ⬛⇒123—Burden rests on vessel violating rule to show that fault did not contribute to collision.**

   Violation of a statutory rule is such a fault as to throw upon the offending vessel the burden of proving, not merely that it might not have

⬛⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

been one of the causes of collision, or that it probably was not, but that it could not have been.

In Admiralty. Suit for collision by Vivian Phillips, as owner of the tug Cynthia, against the steamship Norfolk. Decree dividing damages.

Emory, Beeuwkes & Skeen, of Baltimore, Md., for libelant.
Lord & Whip, of Baltimore, Md., for respondent.

SOPER, District Judge. The owner of the tug Cynthia filed a libel in rem in admiralty against the steamship Norfolk for damages to the tug occasioned by a collision between the vessels on June 6, 1923, in the Baltimore harbor. The allegations of the libel itself, and the testimony of the libelant's witnesses, establish conclusively that, whatever may be the case with the steamship, the tug was flagrantly and inexcusably at fault, as the following recital of facts offered on its behalf will show:

[1] The Cynthia is a bay and harbor tug, 55⁸/₁₀ feet long and 15⁸/₁₀ feet wide; the Norfolk, a steamer 264 feet long by 43 feet beam. The Cynthia was under charter to the mayor and city council of Baltimore, whilst its ferry boat was under repairs, to tow a lighter belonging to the city in ferry service for passengers between the foot of Broadway and Locust Point, a distance of about three-eighths of a mile. The lighter was about 75 feet long, and was equipped with a house with doors in the ends and windows on the sides, and on the top, a lifeboat. At the time of the collision, the lighter was made fast to the starboard side of the tug, so that the stern of the tug projected 12 or 15 feet beyond the stern of the lighter. On the trip in question, Capt. Robinson of the tug, an experienced mariner, was in the pilot house, while Capt. Jorss, the master of the laid-up ferryboat, was in charge of the lighter. The view of the tugboat captain to starboard was shut off by the house on the lighter, and it was necessary that Capt. Jorss on the lighter should perform the duty of lookout. Capt. Jorss denies that he was to perform this duty, but the weight of the evidence is to the contrary. If he was not the lookout, the ferry had none.

The tug and lighter lay in the Broadway slip, bow to the shore. It was about 5 p. m., and the day was clear and calm. Backing out and turning, the trip across was begun. No vessel headed down from the upper harbor in such a way as to affect the navigation of the ferry was seen, and the tug, gathering headway, proceeded at its usual speed of 6 knots per hour. When about one-third of the way across, Capt. Jorss sighted the Norfolk about one-fourth of a mile distant, bound down the harbor on the starboard hand, on a course crossing that of the ferry, at an angle of about 50 degrees. He notified Capt. Robinson on the tug, who blew two blasts of the whistle indicating that he desired to cross ahead of the steamer. No reply to the signal was received. About a minute later, when the ferry was about halfway across, and the vessels were still a safe distance apart, about one-eighth of a mile, the tug a second time blew two blasts and received no reply. It appeared to Capt. Jorss that the steamer was making a speed of 9 or 10 knots per hour. Nevertheless the tug held her course. Capt. Robinson could not see the steamer and supposed he had safely crossed her course,

since it was customary in his experience for a steamer outward bound to follow the middle of the channel. As a matter of fact, the Norfolk was skirting the piers on the Locust Point side, at a distance of 250 feet.

Capt. Jorss on his part apparently gave her no further attention until he heard a single blast of her whistle, sounded when the vessels were only about 100 feet apart. Then at his command, the engines of the tug were reversed at full speed. But it was too late, and despite a similar maneuver on the part of the steamer, it collided with the lighter at a point about 230 feet from the Locust Point Slip, pushing the ferry some distance through the water, and causing the tug to sink.

[2] This is the libelant's case, and it is borne out by the evidence, except as to the signals given by the Norfolk and her speed. There can be no question that the navigation of the tug on her own showing was negligent in the extreme. The vessels were on crossing courses and the starboard hand rule applied. It was the duty of the Cynthia to keep out of the way of the Norfolk, to avoid crossing ahead of her, and on approaching her, if necessary, to slacken speed, stop, or reverse. It was the duty of the Norfolk to keep her course and speed. Inland Rules, art. 19, 21, 22, 23; Act of June 7, 1897; Comp. St. §§ 7893, 7895–7897. The navigators of the ferry obeyed none of the rules applicable to the burdened vessel. They seem to have assumed that the sounding of two whistles by the tug, without response from the steamer, constituted an agreement that the tug should cross ahead of the steamer. But no such consequence followed from the steamer's silence. The use of signals does not justify a steam vessel in a divergence from the governing rule. If a departure from the rule is proposed by one vessel, and consented to by the other, the former is justified in assuming that the other understands, and will govern herself accordingly. But the vessel which is required to keep her course cannot be compelled to depart from it at the instance of the other, and to justify a departure the positive assent of the other vessel, indicated by an interchange of signals, is always necessary. The John King (C. C.) 49 Fed. 469; The Geo. S. Shultz, 84 Fed. 508, 28 C. C. A. 476; The Cygnus, 142 Fed. 85, 73 C. C. A. 309; The Transfer, 145 Fed. 503, 76 C. C. A. 263; The John H. Starin, 162 Fed. 146, 89 C. C. A. 170; The Pawnee (D. C.) 168 Fed. 371; The Montauk, 180 Fed. 697, 103 C. C. A. 663; The Haida (D. C.) 191 Fed. 623; The Scranton, 221 Fed. 609, 137 C. C. A. 333.

Clearly the Cynthia failed in an essential duty, and her conduct was unquestionably a contributing, if not the sole, cause of the collision.

Was the Norfolk also at fault? She left the Clyde Line Pier at Key Highway and Henry street about 4:50 p. m. bound for New York. She proceeded slowly down the harbor, on her own starboard side of the channel, making from 3½ to 5 knots per hour; her engines at half speed. Capt. Forrest, her master, was on the bridge directing the navigation; her chief officer on lookout in the wheelhouse, port side, at the window; her third officer at the wheel. As she approached Locust Point, she was on a course 250 feet from the piers on her starboard, and was porting slightly to round the point. Her officers did not hear

either of the two-blast signals given by the Cynthia. Nor did they see her until the vessels were at a distance estimated to be one-eighth of a mile. Their attention had been engrossed by the maneuvers of a steamer and tug coming out or going in Pier 8, which is located on the Locust Point side about 1,200 feet below the point of collision, and perhaps 1,700 feet from the point which the Norfolk had reached when she first sighted the Cynthia. It was important for the Norfolk to proceed cautiously until the intention of the vessels in the neighborhood of Pier 8 was ascertained. Hence the Norfolk's master turned to the telegraph on the bridge to order the engines to be stopped, when for the first time he caught sight of the Cynthia. He blew one blast of the whistle, indicating that the Norfolk would hold her course and speed, and then having in mind the vessels lower down the harbor, he immediately caused the engines of his ship to be stopped.

It was still possible at the time for the Cynthia to cross under the Norfolk's stern, and the latter's officers, not having heard the Cynthia's signals, had no reason to believe that she would take any other course. Consequently the Norfolk was held on her course until it was clear that the Cynthia intended to cross ahead and until the collision could not be avoided. Just before striking, the Norfolk blew a second signal blast, reversed her engines, and blew danger signals. Her officers testify that the Cynthia answered with one blast the second signal blast of the Norfolk; but, in view of the imminence of the collision at that time, this circumstance is unimportant.

The libelant contends that the Norfolk was negligent in the following particulars:

(1) That she was proceeding at excessive speed.

(2) That she did not have a proper lookout.

(3) That she was guilty of inattention to signals and of crossing signals.

(4) That she did not keep her course and speed as required by Inland Rule, art. 21.

For some time prior to the point at which her officers first saw the Cynthia, the engines of the Norfolk were at half speed, and she was certainly not making as much as 7 knots per hour, permissible under City Ordinance No. 293, April 10, 1909. This was not excessive under the circumstances.

[3] There is more in the claim that her lookout was ineffective. No reason was or could be given to explain the failure of her navigator to see the Cynthia sooner, or hear her signals when they were given. Such inattention justifies the charge. It cannot be said, however, that this neglect contributed to the accident. Had the Cynthia been seen and heard, the Norfolk would have been justified in declining to yield the right of way, and in proceeding upon her course. Careful seamanship no doubt would have suggested the blast of one whistle to signify her intention to abide by the rule; but finally, and in time, she gave such a signal which the Cynthia should have recognized and followed. Had she done so, the collision would not have occurred, so far as can be ascertained from the evidence. The finding of the court is that the

failure of the Norfolk to maintain a more careful lookout did not of itself contribute to the accident so as to make her liable therefor.

[4] Nor was the so-called crossing of signals error on the Norfolk's part. Pilot Rule 2 (adopted by the Board of Supervising Inspectors, Steamboat Inspection Service), which forbids the answering of one whistle with two, or answering two whistles with one, cannot be taken literally. It applies only to signals used to indicate the taking of a course or maneuver authorized or required by the Inland Rules. The giving of a cross-signal is in violation of Pilot Rule 2, where the steamer giving the first signal has indicated a course or maneuver authorized or required by the Rules; it is not a violation of the statutory rules for a vessel to give a cross signal when the steamer first signalling has indicated a course or maneuver not authorized by the Inland Rules or has proposed a departure therefrom. See the cases above cited.

The remaining specification of negligence on the part of the Norfolk is her failure to maintain her course and speed after the Cynthia had been sighted, and it was apparent that the vessels were on crossing courses.

[5] Since the captain of the Norfolk determined to abide by the starboard hand rule, it was obligatory upon him under article 21 of the Inland Rules to navigate the Norfolk so that she would keep her course and and speed. This duty is as definite and precise as the duty of the burdened vessel to keep out of the way. The Britannia, 153 U. S. 130, 14 Sup. Ct. 795, 38 L. Ed. 660; The Northfield, 154 U. S. 630, 14 Sup. Ct. 1184, 24 L. Ed. 680; The Delaware, 161 U. S. 459, 16 Sup. Ct. 516, 40 L. Ed. 771; The Straits of Dover, 120 Fed. 900, 58 C. C. A. 86; The Chicago, 125 Fed. 712, 60 C. C. A. 480; The Powell, 165 Fed. 634, 92 C. C. A. 54; The Gladwish, 206 Fed. 901, 124 C. C. A. 561.

[6] So far as the course of the Norfolk was concerned, it does not appear that there was any failure on her part to abide by the rule. When the Cynthia was sighted, the Norfolk was slightly under a port helm, so as to follow the line of piers and round Locust Point into the lower harbor. The Cynthia had knowledge, or should have had knowledge, from what could be seen, that the Norfolk was engaged in such a maneuver, and might be presumed to intend to continue it. It may be that if the Norfolk had straightened out her course, she would have passed under the stern of the Cynthia without collision; but the Norfolk was under no obligation to abandon the maneuver upon which she was engaged in order to permit the Cynthia to cross ahead. The Roanoke, 11 Asp. M. C. (N. S.), 253.

[7] The more serious matter is the admitted failure of the Norfolk to maintain her speed. While the provision of the rule on this point is definite and clear, the first act of the navigator of the Norfolk, when he determined to hold his course and blew the signal of one whistle, was to reduce the speed of the vessel by shutting off the engines. It may be admitted that a change of speed is sometimes rendered necessary by the presence of a third vessel, for which provision must be made. In such cases, the giving-way vessel has knowledge, or should have knowledge, of the presumable course and speed of the holding-on vessel, and must

govern her actions accordingly. The Banshee, 6 Asp. M. C. (N. S.) 221; The New York, 175 U. S. 187, 20 Sup. Ct. 67, 44 L. Ed. 126; The Illinois, 103 U. S. 298, 26 L. Ed. 562.

The respondent contends that the presence of the steamer and tug in the neighborhood of Pier 8 made it necessary to reduce the speed of the Norfolk. This contention, however, is not borne out by the testimony. While the Cynthia was still a safe distance away, and had sufficient time to comply with the starboard hand rule, it was or should have been apparent to the master of the Norfolk that careful navigation would be required to avoid an accident. His first duty was to the nearer vessel, and he was obligated to maintain not only his course, but also his speed with reference to the crossing. Moreover, the tug and steamer were more than 1,200 feet from the Cynthia's course, so that the Norfolk could have easily avoided a collision with the more distant vessels after she had safely passed the Cynthia.

The court must find that there was no emergency which justified the reduction of the Norfolk's speed.

[8] The burden of proof is on the Norfolk to show that her failure to abide by the rule had no connection with the accident which followed. It has been repeatedly held that the breach of a statutory rule is such a fault as to throw upon the offending vessel the burden of proving, not merely that the breach might not have been one of the causes of the collision, or that it probably was not, but that it could not have been. The Pennsylvania, 19 Wall. 125, 22 L. Ed. 148; Belden v. Chase, 150 U. S. 674, 679, 14 Sup. Ct. 264, 37 L. Ed. 1218; The Martello, 153 U. S. 64, 14 Sup. Ct. 723, 38 L. Ed. 637; The Britannia. 153 U. S. 130, 14 Sup. Ct. 795, 38 L. Ed. 660; Lie v. San Francisco & Portland S. S. Co., 243 U. S. 291, 37 Sup. Ct. 270, 61 L. Ed. 726. See, also, the decision in this circuit in the case of The Southern (D. C.) 224 Fed. 210. affirmed in 235 Fed. 78, 148 C. C. A. 572, wherein it is declared that it is the duty of the privileged vessel to keep its course and maintain its speed whenever by any possibility a change of either might conceivably contribute to a collision.

It cannot be said in this case that the slackening of the Norfolk's speed had no possible connection with the collision. At the moment of contact, the port bow of the Norfolk collided with the starboard side of the lighter a few feet aft its beam. The Norfolk had been running with her engines shut off for a distance of more than 600 feet as shown by the relative positions in the stream, of the point where her engines were stopped and the point of collision as they were marked on the chart by her master in the course of his testimony. The evidence does not demonstrate to a certainty that had the Norfolk continued at half speed, instead of proceeding with a diminishing headway, the collision would have been avoided; but the probabilities are that she would have crossed ahead of the Cynthia without accident. One comes to this conclusion, so far as the Norfolk is concerned, with reluctance because of the glaring fault of the Cynthia; but with the Norfolk, as with the Cynthia, the case has been decided upon her own statement of the circumstances.

It follows, therefore, that both vessels were at fault, and that the damages must be divided.