## THE CYRENE.

### THE FELL LOVELAND.

### WILLIAMS et al. v. NORFOLK, BALTIMORE & CAROLINA LINE, Inc.
### No. 4055.

Circuit Court of Appeals, Fourth Circuit.
Oct. 6, 1936.

Braden Vandeventer, of Norfolk, Va. (Vandeventer & Black, of Norfolk, Va., on the brief), for appellants.

John W. Oast, Jr., of Norfolk, Va., for appellee.

Before PARKER and SOPER, Circuit Judges, and MYERS, District Judge.

SOPER, Circuit Judge.

About 7 p. m. on October 21, 1935, at ebb tide on a clear fine evening, a collision took place off Coal Pier No. 1 at Lambert Point in the lower part of the Norfolk Harbor, between the motor vessel Pawtucket and the barge Fell Loveland then in tow of the tug Cyrene. The Pawtucket is a freight vessel 149.8 feet long by 28.8 feet beam. She was bound for Baltimore and was proceeding in a northwesterly direction on the eastern side of the 750-foot dredged channel, followed at a distance of approximately 250 yards by the Old Bay Line steamer, President Warfield, a much larger and swifter vessel. The Cyrene is

a tug boat 71.5 feet long by 19.6 feet beam. The Fell Loveland is a barge 193 feet long by 23.8 feet beam. Prior to the collision, the flotilla had left the Army Base Piers 6 or 7 miles distant from the scene of the accident and proceeded in a southerly direction on the west side of the channel until it passed Craney Island and approached the vicinity of the coal piers, when it gradually crossed to its port side eastward of mid-channel. The starboard side of the tug was made fast against the port quarter of the barge, the bow of the barge extending about 130 feet beyond the bow of the tug. The speed of the Pawtucket was 8 or 9 miles an hour and of the flotilla 3 or 4 miles an hour. The collision took place on the easterly side of the channel about 150 feet off the end of pier No. 1 when the stem of the barge came in contact with the port side of the Pawtucket, causing an estimated damage of $9,000 to that vessel and $1,200 to the barge. Cross-libels followed.

The dredged channel of the harbor proceeds in a northwesterly direction as one approaches the coal piers on Lambert Point from the south, and then at a point on the eastern side marked by flashing buoy 23 the course changes to north northwest for a distance of approximately 540 yards until a point opposite the end of pier No. 2 is reached when the course again changes and becomes slightly west of north. The point of collision off the end of pier No. 1 is approximately 175 yards north of the last-mentioned bend in the channel. Changes in the course of the vessels proceeding north and in the lights which they presented to the flotilla as they rounded the bends in the channel, and a misunderstanding of signals exchanged when the colliding vessels were still one-half mile apart, contributed to the accident.

The trial court found that shortly after the Pawtucket passed buoy 23 and altered her course to north northwest, the Warfield, then off the port quarter of the Pawtucket and 250 yards astern, gave two blasts of her whistle, intended, according to her crew, as a warning or passing signal to a small power boat on the extreme easterly edge of the channel. The master of the Pawtucket thought that the blasts were intended for his vessel as a request to pass to her port and gave assent by an answering signal of two blasts. The tug was then one-half mile distant on her port side of the channel. Her master thought that the two two-blast signals of the approaching vessels were intended for him as a proposal for a starboard to starboard passing, and he therefore gave two blasts of his whistle to indicate his assent. The master of the Pawtucket on his part thought that the two blasts from the tug were directed only to the Warfield as a proposal that the tug and the Warfield should pass starboard to starboard, and made no response to the tug's signal.

Testimony was given by the crews of the tug and the barge that before any of the two-blast signals were given, the tug gave a one-blast signal to the Pawtucket indicating a port to port passing. No other witnesses heard this signal, and the District Judge found that it was not given at all, or was so subdued as not to carry any considerable distance. The point is not of importance, since the tug admitted that she gave a two-blast signal after hearing similar signals from the approaching vessels.

The Pawtucket, after hearing the two-blast signal from the tug, continued on her course, remaining well over on her starboard side of the channel, her master believing that the flotilla intended to pass the Pawtucket port to port and the Warfield starboard to starboard until very shortly before the collision when, for the first time, he saw both the red and green lights of the tug. Thereupon he promptly ported his helm and swung abruptly to starboard, giving a signal of one blast. The tug reversed; but it was too late, and the projecting bow of the barge came into contact with and scraped along the port side of the Pawtucket, doing considerable damage to both vessels.

■ The court found that the tug was at fault in three particulars: (1) In proceeding upon its port side of the channel in violation of the narrow channel rule; (2) in failing to have the barge properly lighted and its presence ahead of the tug indicated; and (3) in negligently assuming that it had an understanding with the Pawtucket for the vessels to pass starboard to starboard. With two of these findings we are in accord. The presence of the tug on the wrong side of the narrow channel was without justification or excuse. Her master admitted that the westerly side of the channel was clear and that it would have been safe and practicable to keep to his starboard side of the fairway, as required by article 25 of the Inland Rules, 33 U.S.C.A. § 210, and Pilot Rule 10. His pur-

pose was to cut across the bend in the channel, doubtless to save distance, and also, as he admitted, in order to come close to the ends of the piers which to some extent broke the force of the adverse ebb tide. Had the tug obeyed the rules in this respect, the vessels could have safely passed port to port, and no occasion would have arisen for the exchange of signals which seemed to her master to indicate a starboard to starboard passing, partly because the tug was on her port side of the channel. Hence it is impossible to find that the tug's breach of the statute could not have contributed to the disaster; and nothing short of such a finding would excuse the offending vessel. The Pennsylvania, 19 Wall. 125, 126, 22 L.Ed. 148; The Delmar (C.C.A.) 257 F. 42; The Norfolk (D.C.) 297 F. 251, 256.

The lighting of the flotilla was also defective. The tug carried very brilliant electric red and green side lights and three towing lights on her staff. (Two towing lights would have been sufficient under article 3 of the Inland Rules, 33 U.S.C.A. § 173, but the additional light had no bearing on the collision.) The barge, according to her crew, carried two horizontal oil lights astern, a green oil light at the starboard beam and an oil light hanging over the bow on the outside. No one off the barge, not even disinterested witnesses, saw either the bow light or the green light of the barge before the collision. Pilot Rules for Certain Inland Waters, revised to February 6, 1935, page 24, provide that when two or more boats are abreast, the colored lights shall be carried at the outer sides of the bows of the outside boats. Had this rule been followed, the tug's green light would have been extinguished and her red light would have been carried at the outer side of her bow and the green light similarly situated on the bow of the barge. With such an arrangement, it is quite possible that the master of the Pawtucket would have been aware of the approaching forward end of the barge in time to have avoided the collision, for as it was, the barge struck the Pawtucket only a glancing blow as the latter sheered off, and the tug was not in contact with the Pawtucket at all.

The charge of negligence based upon the tug's misunderstanding of the passing signals raises a more debatable question. The court held that the master of the tug could not reasonably expect the approaching vessel to make allowance for his own grave breach of the rule in using the wrong side of the channel, and that he should have understood that the two-blast signals of the Pawtucket and the Warfield were not intended for him, but as an interchange between themselves, located as they were one-half mile distant from him, but in close proximity to each other. The court found that as the Pawtucket and the Warfield approached buoy 23, their green lights probably showed to the red light of the tug for a short time due to the bends in the channel and the presence of the tug on the eastern side of the fairway; but after the Pawtucket passed the bend and altered her course, her lights and those of the tug were showing red to red so that a port to port passing was clearly indicated, and the misunderstanding of the signals on the part of the tug was inexcusable.

The court was properly impressed with the grave fault of the tug in using the wrong side of the channel, for it is well settled that the burden rests on a vessel guilty of a major fault in navigation to establish by clear and convincing evidence . that faults in the management of another vessel in collision contributed to the result, and that doubts regarding the management of the other vessel should be resolved in her favor. The Victory and the Plymothian, 168 U.S. 410, 422, 423, 18 S. Ct. 149, 42 L.Ed. 519. Nevertheless, we are unable to conclude after careful consideration of the facts as found by the court, that the confusion which arose upon the exchange of the two-blast signals between the approaching vessels was caused entirely by the tug without contributory fault on the part of the Pawtucket.

There is a conflict of evidence as to whether the red light of the Pawtucket was visible to the tug at the time that the two-blast signals were exchanged after the Pawtucket had passed the first bend in the channel at buoy 23. There is weighty testimony to the effect that the red light of the Pawtucket could not have been seen by the tug until the Pawtucket passed the second bend in the channel off pier No. 2. The master of a nearby tug, produced as a witness for the Pawtucket and described by the court as an apparently disinterested witness in a favorable position to observe the vessels shortly before and at time of the impact, testified that until a vessel, pro-

ceeding northerly in the channel, makes the second change of course opposite pier No. 2, her green light only can be seen by a vessel coming south. If this testimony is accepted as correct, it would have been entirely reasonable for the tug to have inferred from the signals that the Pawtucket, finding the tug on the wrong side of the channel, desired to pass her starboard to starboard. But even if the finding of the court, that the Pawtucket after passing buoy 23 showed her red light to the tug, be accepted, it is still hard to understand why the master of the Pawtucket did not comprehend that the two-blast signal from the tug was intended for him as well as for the Warfield, and alter his course accordingly; or if he failed to understand the signal of the tug or thought that a starboard to starboard passing was dangerous, why he did not indicate his dissent by blowing danger signals in accordance with the rules applicable to such a situation. See article 18, rule 3, 33 U.S.C.A. § 203, rule 3; rule 26, 33 U.S.C.A. § 291. Although the normal passing of the vessels was port to port under the conditions found by the court, the Pawtucket had apparently initiated a starboard to starboard passing by her signal, and the invitation had been accepted at a time when the proposed maneuver was safe in view of the positions of the vessels and the width of the channel. Undoubtedly this arrangement involved a departure from ordinary usage; but if a departure from a navigation rule is proposed by one vessel, and consented to by the other, each vessel is justified in assuming that the other understands and will govern herself accordingly. The Lake Calvenia (C.C.A.) 2 F.(2d) 416; The Lowell M. Palmer (C.C.A.) 142 F. 937; The Transfer (C.C.A.) 45 F.(2d) 571; The St. John, 154 U.S. 586, 14 S.Ct. 1170, 20 L.Ed. 645, and see The Norfolk (D.C.) 297 F. 251, 253.

Under these circumstances, we do not think that the tug was bound to know that the signals of the Pawtucket and the Warfield were intended only for each other. As a matter of fact they were not so intended, for the Warfield was signaling the power boat and had no intention of passing the Pawtucket. Moreover, the Pawtucket heard the tug's answer and wrongfully supposed that it was intended for the Warfield but not for her. It is precisely at this point that the Pawtucket's defense breaks down; for it involves the untenable assumption that the tug, having received the same signal from both approaching vessels, intended to recognize it as to one vessel and to ignore it as to the other. It was unreasonable for the master of the Pawtucket to make this assumption, because the Warfield was following the Pawtucket at a short distance either directly astern or off her port quarter, and the intended course of the tug, as the master of the Pawtucket claims to have understood it, involved the dangerous and unnecessary maneuver of passing between the two approaching vessels, port to port with the Pawtucket and starboard to starboard with the Warfield. Hence we conclude, notwithstanding the well-founded finding that the tug was guilty of an initial fault without which the collision would not have occurred, that the master of the Pawtucket was to blame for ignoring the two-blast whistle of the tug and attempting to pass port to port in spite of an apparent agreement to pass starboard to starboard.

■ The Pawtucket was also blameworthy in that she was proceeding in a narrow channel in a busy harbor at night without a lookout on the bow. Article 29, 33 U.S.C.A. § 121 provides in part that nothing in the rules shall exonerate any vessel or the master or the crew thereof from the consequences of any neglect to keep a proper lookout. See The Adriana (C.C.A.) 6 F. (2d) 860; The Curtin (D.C.) 205 F. 989. It is suggested that the absence of the lookout in this case did not affect the situation materially because the master and a wheelman of the Pawtucket were in the pilot house comparatively near the stem, and there was nothing to obstruct their view. But it does not seem to us to follow that a lookout on the bow unemcumbered with the navigation of the vessel would not have realized the danger sooner and have taken steps to avert the collision. The master had to keep under observation the power boat on his starboard hand and the overtaking steamer from the rear, and he could not give his undivided attention to the approaching flotilla. A lookout on the bow may well have seen the oil light on the bow of the barge or its green light on the starboard side at an earlier point of time and the accident may have been avoided.

Both vessels were at fault, and the case must be remanded to the District Court, with directions to assess the amount of

the damages resulting from the collision, and to modify its decree so as to hold both vessels at fault and to divide the damages and costs between them. Costs in this court will also be divided.

Modified and remanded.