## THE CYGNUS.

### THE H. F. DIMOCK.

(Circuit Court of Appeals, Second Circuit. December 5, 1905.)

### Nos. 19, 20.

COLLISION—STEAMERS CROSSING—VIOLATION OF STARBOARD HAND RULE.

A collision occurred in the daytime on the Hudson river a short distance above the Battery between the steamers Dimock and Cygnus on courses crossing at nearly right angles. The Dimock had rounded the Battery from East river and was proceeding near the New York piers to her own pier a short distance above. The Cygnus was crossing over

from near the New Jersey side to her own pier, which was below that of the Dimock. She saw the latter when coming around the Battery and knew her destination; but the master was ignorant of the rule which made his the burdened vessel because of having the Dimock on her starboard side, and assumed that when he had given the first signal of two blasts it gave him the right of way, and, although such signal and a second one were crossed by the Dimock by a single blast, he continued his course and speed until too late to, stop his headway, and came into collision with the Dimock, which had kept her course and speed. *Held*, that the Cygnus was clearly and grossly in fault for going contrary to the rule, and responsible for the collision; that the Dimock was not in fault for keeping her course and speed in accordance with the rule after she had refused to assent to the signal of the Cygnus, since she had a right to rely on its being followed by the Cygnus, and that the latter would keep out of the way until it was too late to avoid the collision, and had no means of knowing that the master of the Cygnus was ignorant of its requirements.

Appeals from the District Court of the United States for the Eastern District of New York.

This cause comes here upon cross-appeals from a decree of the District Court, Eastern District of New York, holding both vessels in fault for a collision in the North river, slightly above Pier 1 on June 15, 1902, at 6:30 p. m.

Harrington Putnam, for Metropolitan St. S. Co.

George W. Wingate, for the Cygnus.

Before WALLACE, LACOMBE, and COXE, Circuit Judges.

LACOMBE, Circuit Judge. The following excerpts from the opinion of the district judge sufficiently indicate the movements of the vessels:

"The Cygnus [bound up from Coney Island] passed the Statue of Liberty, proceeded directly up the North river, on the westerly side thereof, and made a turn to starboard in the neighborhood of the Central Railroad Ferry on the New Jersey shore, thereupon passed over a distance of at least 2,000 feet and collided almost at a right angle with the Dimock, which was about 200 feet off Iron Pier No. 1, which was the Cygnus' immediate destination. The Dimock came down the East river and rounded into the North river at a distance of at least 600 feet off the Battery, gradually approached the New York shore, and proceeded towards her Pier No. 11 until the time of the collision."

The Dimock was moving slowly, putting her engines "alternately ahead and backward * * * to regulate her motion for entering her slip at Pier 11, which she was approaching on the flood tide, and she was in motion when the collision happened."

There is some conflict as to how many signals were sounded and at what precise points they were given. For the purposes of this appeal the narrative of the captain of the Cygnus may be taken as correct. He says that when he first saw the Dimock he was about up to the anchorage buoy, which is about midway between Ellis Island and the Communipaw Ferry; at that time he had commenced to put his wheel to port and had turned nearly across the river, heading nearly for the New York shore. At that time he began to navigate with reference to the Dimock and had her then, and at all times afterwards, on his starboard hand. When he sighted the Dimock she was making her

turn around the Battery and had progressed so far in it that her bow was heading about for the Pennsylvania Ferry. That ferry lies a considerable distance above Communipaw, and if the Dimock were pointing in that direction she certainly could not have had the Cygnus on her starboard hand, unless the latter had passed so far along that the courses were no longer crossing "involving risk of collision." The Cygnus recognized the Dimock, knew to what line she belonged, that her pier was No. 11, and that she would have to go in there and not to Jersey City. Beginning to navigate with the Dimock on her starboard hand, the Cygnus was the burdened vessel, and under the rule the Dimock was bound to maintain her course and speed. The Cygnus, as her captain says, sounded a two-whistle blast about as she turned towards the New York shore, soon after he heard one whistle from the Dimock. Thereupon he again blew a two-whistle blast, to which he again received a reply of one whistle. He heard no other whistles, though there is little doubt that the Dimock blew a third one. In the face of the two single blast signals which he did hear, indicating that the privileged vessel was going to navigate in compliance with the starboard-hand rule and to cross his bows, and although he saw that the Dimock had completed her turn and was going up along the New York shore, the captain of the Cygnus nevertheless kept on until he had gone so far that, although he did at last stop and back, he could not check his boat in time to avoid collision. We concur with the district judge in the conclusion that "it is impossible to find any excuse for the Cygnus."

The explanation of his navigation is found in the following quotation from his testimony:

"Q. Isn't it the fact that under the rule, if she was on your starboard hand and the courses were crossing, you having a vessel on your starboard hand must give way to her; isn't that so? A. Not as I understand the rule; no, sir. Q. Do you understand because you blow two whistles that gives you a right to keep on and cross her bow? A. As I understand the inspector's rules; yes, sir. Q. If you had heard her whistles first instead of your whistles first what would you have done? A. I would have stopped my boat. Q. You think that having blown two blasts and having gotten them in first that gave you a right to keep on across her bow? A. Yes, sir. Q. You understood it gave you the right of way? A. Yes, sir. Q. And you navigated on that assumption? A. Yes, sir."

Undoubtedly the unfortunate provision in the inspectors' rules about "not crossing signals," which—even before its formal enactment in the amendment of 1899 (where it is restricted to vessels meeting end on)— was generally accepted by pilots as what the board required, has within the experience of this court, been prolific of disaster. It operated to induce a belief among some pilots that by giving the first signal they could relieve themselves of the burden which the rules of navigation imposed upon them. But it is, indeed, surprising to find that, in this harbor, 11 years after the decision in The John King, 49 Fed. 469, 1 C. C. A. 319, and four years after the decision in The George S. Schultz, 84 Fed. 508, 28 C. C. A. 476, an excursion boat, carrying sometimes thousands of people, is intrusted to the command of a man who does not know that the starboard-hand rule requires him to keep out of the way of the privileged vessel (which is itself to

keep course and speed), unless both vessels have by timely interchange of signals affected an agreement to undertake to navigate otherwise than as the rule provides. The fault of the Cygnus was gross, and was undoubtedly the cause of the collision.

The only other question in the case is whether the Dimock was also in fault. She was entitled to come down the East river and turn into the North river, directing her course towards her own pier. She was not bound, because at some time in her turning movement her head pointed to Jersey City, to keep on in that direction, merely because she saw the Cygnus on the Jersey side and knew the latter was about to turn in for her pier. They were nearly the whole distance of the river apart, she was on the starboard hand of the Cygnus and therefore privileged, and it was perfectly easy and not even inconvenient for the Cygnus to keep out of her way. Had her pier been some distance up the river, there might be force in the suggestion that she should have gone further out, but Pier 11 is so near the Battery that she was clearly justified in not making such a wide sweep, although in consequence she navigated nearer to the piers. She was not moving at an excessive speed, she repeatedly announced by signal blast just what her course would be; she obeyed the rule, and kept her course and speed. The district judge held her in fault solely because she did not stop and reverse. He says:

"If the mere omission of the Cygnus had been a failure to stop earlier, it could without difficulty be determined that the Dimock should be relieved, for just when or where a paddle-wheel vessel shall stop to avoid another vessel is best known to her navigators, and depends upon conditions peculiar to herself, of which those on the opposite vessel can have no nice appreciation. But when to the continued progress is added a cross-signal and failure to respond to later signals [the privileged vessel is to be held in fault]."

It should be remembered, however, that the master of the Dimock had no means of knowing that the master of the Cygnus was ignorant of the provisions of the rule, and that he supposed the Cygnus to be privileged. The master of the Dimock could only judge of the situation from what he saw. There was nothing perilous in the Cygnus turning and heading for Pier 1. She was then on the other side of the river. Nor was there any threat of danger in her so-called "cross-signal." The Cygnus' two blasts given at that time were but an invitation to modify the rule which she was perfectly justified in proposing. It might well be assumed that, so long as the invitation, even if repeated later still at a safe distance, was not accepted, the rule would be followed. There was no risk in the Cygnus coming well over towards the eastern shore, while the Dimock was holding her course up river near the piers and proclaiming her intention to continue such course, for, being a paddle-wheel boat, she could check her headway promptly. The Dimock was in the situation in which so many other privileged vessels have been put by gross disregard of the obligation laid upon a burdened vessel; where one cannot tell at what moment of time the other vessel will conform to the rules, and where an effort to save catastrophe by altering course or changing speed may coincide precisely in time with some change by the other boat, and thus precipitate the disaster, instead of avoiding it. We have recently con-

sidered this subject in The City of Augusta and The Chicago, 125 Fed. 712, 60 C. C. A. 480, where the situation was in some respects similar to the one at bar, and called attention to the forcible exposition of the duty of the privileged vessel which is found in The Talisman and The Delaware, 161 U. S. 459, 16 Sup. 521 (40 L. Ed. 771), where The Talisman was held free from fault, although she twice sounded signal blasts and then an alarm, none of which were answered, but did not change her helm or reduce her speed before collision. The Supreme Court in The Talisman said:

"The preferred steamer will not be held in fault for maintaining her course and speed as long as it is possible for the other to avoid her by porting, at least in the absence of some distinct indication that she is about to fail in her duty. If the master of the preferred steamer were at liberty to speculate upon the possibility or even the probability of the approaching steamer failing to do her duty and keep out of his way, the certainty that the former will hold his course, upon which the latter has a right to rely, and which it is the very object of the rule to insure, would give place to doubts on the part of the master of the obligated steamer as to whether he would do so or not and produce a timidity and feebleness on the part of both, which would bring about more collisions than it would prevent."

Reference may also be had to The Britannia, 153 U. S. 130, 14 Sup. Ct. 795, 38 L. Ed. 660, and The Northfield, 154 U. S. 629, 14 Sup. Ct. 1184, 24 L. Ed. 680. In the City of Augusta we distinguished The New York, 175 U. S. 187, 20 Sup. Ct. 67, 44 L. Ed. 126, and The Albert Dumois, 177 U. S. 240, 20 Sup. Ct. 595, 44 L. Ed. 751, and, in view of so recent a discussion of the question, deem it unnecessary to renew it here. We find the Cygnus solely in fault for the collision.

The decree is reversed, with costs to the Dimock, and cause remanded, with instructions to enter a decree against the Cygnus, in favor of the Dimock, for her damages, interest, and costs.