### THE SENATOR RICE.

### THE LUZERNE.

#### (District Court, E. D. New York. April 9, 1914.)

1. COLLISION (§ 37*)—CROSSING RULES—STARBOARD HAND RULE.

With the starboard hand rule for crossing vessels must be considered the rule forbidding the giving of a cross or contradictory whistle, unless the vessel crossing whistles had the right to insist, at that moment, upon its own indication of course, and that vessel could, under the circumstances of the case, safely seek to initiate navigation by forcing the application of the rule upon the other vessel.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 34–36; Dec. Dig. § 37.*]

2. COLLISION (§ 93*)—TUGS WITH TOWS—CROSSING SIGNALS.

A collision on the Hudson river between a barge in tow of a tug proceeding up the river and a car float in tow alongside a tug intending to cross from the New York side, but at the time the vessels were approaching each other on a variable course, held due solely to the fault of the latter tug in crossing the two-whistle signal of the up-bound tug, given when the two were on overtaking courses, and in attempting to change to a crossing course and to enforce the right to pass ahead of the other tow, under the starboard hand rule.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 194, 195; Dec. Dig. § 93.*]

In Admiralty. Suit by the C. F. Harms Company against the steam tugs Senator Rice and Luzerne, and cross-suit by the Lehigh Valley Transportation Company, owner of the Luzerne, against the Senator Rice. Decree for libelant against the Luzerne.

Foley & Martin, of New York City (W. J. Martin, of New York City, of counsel), for C. F. Harms Co.

Amos Van Etten, of Kingston, N. Y., for steam tug Senator Rice.

Harrington, Bigham & Englar, of New York City (D. Roger Englar, of New York City, of counsel), for Lehigh Valley Transp. Co.

CHATFIELD, District Judge. The libelant, the C. F. Harms Company, has brought action against the Senator Rice and the Luzerne for damage to a boat towed by the Senator Rice and injured by contact with a car float alongside the Luzerne, which belongs to the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Lehigh Valley Transportation Company. The collision occurred on May 29, 1913, in the Hudson river, and no fault on the part of the barge has been shown. The Lehigh Valley Transportation Company filed a cross-libel against the Senator Rice, and the cases have been tried on one record.

It is apparent that the libelant should recover against one or both of the tugs, and that the cross-libel should be disposed of in accordance with the finding of fault upon the testimony presented. The facts have been previously found and stated as follows, at the close of the case:

This collision happened in broad daylight near the center of the Hudson river and on a line, as indicated, substantially without question, by the witnesses, drawn from New Pier 1 to the float bridges just south of the Morris and Essex Canal entrance. There is substantially no conflict as to the position in which the boats came together. The Luzerne had the car float on her starboard side; the car float projecting ahead of the tug. The port forward corner of the car float came in contact with the starboard side of the barge Southern Cross, which was on a hawser 150 feet in length immediately behind the Senator Rice. The barge Schultz, which was close behind the Southern Cross, also came in contact with the port forward corner of the float, and the hawser between the barges parted.. It makes no difference, so far as the finding is concerned, whether the float went between the barges and broke the hawser by its impact or whether the hawser was parted by the pull from the Senator Rice, except so far as it may help determine whether the Luzerne did, or did not, have headway.

The damage to the Southern Cross, which is the basis of this action, was without any fault on the part of the Southern Cross, and there is no dispute as to the general direction of the course of the Senator Rice at the time. She had come around the Battery, taken her course up the Hudson river, and her boats, influenced by the ebb tide and the northwest wind, were following in a steady course, but, according to one of the witnesses from the Luzerne, each was slightly off from the straight line and further towards New York. The Luzerne reversed her engines. According to her engineer's testimony, she was under reverse motion about sufficient time to lose headway, and he testifies that he saw the wash coming up along the tug just before the collision.

The testimony of the Southern Cross's captain is that the car float was still moving ahead while in contact with his vessel, so that she had not entirely lost her way.

The testimony of all the witnesses is that the effect of the reversing would be to swing the float to port and to stop its headway; but whether or not the float was actually moving backward is of little consequence, for the question of responsibility controls, rather than that of whether the Luzerne had succeeded in entirely stopping the way of the car float, it being evident that the difference between actually moving backward or having substantially stopped would not affect the issue in the case. That is, if the error were one of judgment as to the distance in which the car float could be stopped so as to let the Senator Rice go by, the responsibility would be exactly the same,

and that apparently is not the fault alleged on the part of the libel-
ants or by the Senator Rice.

The only disputed facts which bear on the situation are with relation
to the whistles and to the position and course of the boats at the time
the whistles were blown. Another tow in charge of the Decker was
coming around the Battery, but far enough astern so that it did not
complicate the movements of the vessels. A sand scow in charge of
the Automatic had passed up the river far enough ahead of the Sena-
tor Rice so that it could safely cross the bow of the Luzerne and did
not obscure either the view of the Luzerne or the Senator Rice. A
tramp steamer in tow of tugs passing up inside of the Senator Rice
(that is, towards New York), having gone under the stern of the
Senator Rice's tow, compelled the Senator Rice to proceed to keep
her tow out of the way of the steamer. This steamer went under the
stern of the Luzerne, and there was sufficient room so that the Lu-
zerne could safely cross her bow.

The actual course of the Luzerne after she crossed the bow of the
steamer and was headed for the floats at Port Morris would be a
little north of directly across the river, and the Luzerne would have
been turning from a course down river (which was the first course she
could take after coming out of the slip) entirely around upon a port
wheel until she was upon the course towards the car floats. Accord-
ing to the testimony, she had made this turn and was proceeding to-
wards New Jersey for some distance before she crossed the bow of
the tramp steamer and before any danger arose because of her proxim-
ity to the Senator Rice.

Another question which is in conflict, other than that of the whistles,
is the exact position of the Senator Rice with reference to the course
of the Luzerne at the time when the Luzerne began to reverse. The
captain of the Senator Rice testifies that he had then crossed the Lu-
zerne's course, having already given a two-whistle signal, which had
been answered by a one-whistle signal. The one-whistle signal, if the
Rice had already passed, would indicate that the Luzerne was going
up the river and around his bow.

The testimony of the deck hand on the Luzerne was given very
definitely and was exact in all details. He says that the Senator Rice
was some 200 feet down river from the point where the vessels could
cross at the time that the Luzerne was some 200 feet back of the
point of crossing and when the Luzerne signaled to reverse her engine.

·It would seem from the testimony that the Senator Rice did blow
a two-whistle signal, and that the Luzerne had blown a one-whistle
signal, at a time when the Senator Rice and the Luzerne could each
observe the other. It also appears that the Luzerne paid no attention
to the Senator Rice nor to the two-whistle signal which she had blown
further down the river, upon the assumption that the Senator Rice was
the burdened vessel and that the Luzerne need not take her position
into account until at the time of the alarm whistle.

It is apparent from the testimony that the blowing of an alarm
whistle by. the Luzerne, followed by a signal to reverse and the re-
versal of her engines, coupled with the testimony of the witness upon

the float that at that time the Senator Rice had not actually crossed the path of the Luzerne, and the improbability of the Luzerne blowing a one-whistle signal after the Senator Rice had crossed her course and was further up river, proved that the Luzerne gave the alarm and blew the whistle to reverse because she could not cross the course of the Senator Rice, and that up to that time she had persisted in attempting to do so. At that time the course of the Luzerne was slightly up river (that is, in the direction of the movement of the Senator Rice), but the courses would be crossing courses, and it would appear that the Senator Rice would arrive first at the point where the courses would cross.

The question, therefore, is one of responsibility. If the Luzerne had the right, after taking a course across the river which would intersect the course of the Senator Rice up river, to hold her course and speed because the Senator Rice had the Luzerne upon her starboard hand, then, as the Luzerne did not accept the signal of the Senator Rice but did for a time hold her course and speed, the Senator Rice would be to blame for insisting by giving another two-whistle signal and creating danger.

If the Senator Rice was upon a course which, from the apparent situation, would bring her to the point of crossing sufficiently ahead of the Luzerne to remove her from the starboard hand rule, or if the course of the Luzerne was not such that she could evoke the starboard hand rule, then the plain position of the Senator Rice across the path of the Luzerne (whether or not whistles were given, and especially in view of the fact that a two-whistle signal was given before the courses were definitely shown to be crossing) show a situation where the starboard hand rule would not avail, and the Luzerne would be responsible for the situation. If, by error of judgment or by force of circumstances, she could not get sufficient sternway under reversing to clear the drift of the barges, the Luzerne would be liable.

The questions of law thus presented have been argued upon briefs, and the case finally submitted.

According to the testimony, the Luzerne had been swinging at least 180 degrees before undertaking to go straight ahead across the river. She passed astern of the Automatic but ahead of the tramp, and in so doing took a course which would intersect that of the Senator Rice. She then received the two-whistle signal of the Senator Rice, which she answered with one whistle, and shortly reversed her engines to avoid collision. Having continued thus reversed for substantially a sufficient time to bring her to rest, she nevertheless was so headed as to strike the port forward corner of her float against the side of the barge injured. In other words, she must still have been headed somewhat upstream of straight across the river, and the testimony is all to the effect that, proceeding under a reversed engine, she could swing the bow substantially to port in less time than it would take to stop the headway of the vessel.

The presence of the car float upon the starboard hand of the Luzerne would increase the tendency to turn her bow to port, and if the only object of the Luzerne, in extremis, was to avoid collision by reversing,

it is impossible to see how she could have struck the barge as she did, if she had previously been heading straight across the river. On the other hand, before the boats had permanently started upon what were crossing courses, but at a time when the Luzerne was proceeding in such a direction that the Senator Rice saw the need of signaling, the latter blew a two-whistle signal to keep the Luzerne from trying to force the Senator Rice to give way if the Luzerne was going across the river. The one-whistle signal by the Luzerne indicated that the Luzerne was intending to insist upon the course which she appeared to be taking.

[1] With the starboard hand rule must be considered the rule forbidding the giving of a cross or contradictory whistle, unless the vessel crossing whistles had the right to insist at that moment upon its own indication of course, and if that vessel could, under the circumstances of the case, safely seek to initiate navigation by forcing the application of the rule upon the other vessel.

[2] It appeared from the testimony that the Senator Rice was unable to hold back and allow the Luzerne to cross her bow. She apparently knew where the Luzerne was proceeding, and that the Luzerne might require an indication as to the course of the Senator Rice. This indication was given by the two-whistle signal. Up to that time the Luzerne had not reached a position nor assumed a course which would prevent the Senator Rice from indicating that the starboard hand rule could not be safely relied upon. The Luzerne saw fit to differ and to indicate that she not only was proceeding in a direction which would make the starboard hand rule applicable, but that she was going to insist upon that rule and to proceed, holding her course and speed. As a matter of fact, she did not come in collision with the Senator Rice, but struck the barge some distance further back and also to the east of the course of the Senator Rice. The Luzerne was headed further up the river than if she had been holding her indicated course and speed until she was under reversal. It is possible that the Luzerne tried to turn upstream while reversing, so as to save time, or she may have been influenced by trying to go astern of the Automatic and yet get upstream ahead of the Senator Rice.

The indications are that the Luzerne was operating upon a general changing course, which would make her an overtaking instead of a crossing vessel, if she did not proceed, or was not allowed to proceed, in a straight line, so as to reach the intersection of the courses first. She came into collision through inability to entirely lose momentum before reaching the tow of the Senator Rice. The Luzerne was apparently, therefore, at fault for giving a cross signal and attempting to compel the application of the starboard hand rule at a moment too late to avoid collision, if her cross signal was not accepted, and at a time when she had not previously assumed a definite course which made the Senator Rice a wrongdoer in giving a two-whistle signal. The Luzerne is further at fault in apparently attempting to treat the situation as one of crossing courses, when her own observation and her previous movements rendered it likely to result in the situation of her being an overtaking vessel; and the mere fact that for a short

period, at about the time of the whistle, the Luzerne was proceeding in a direction which, if pursued, independent of other circumstances, would have been a crossing course to that of the Senator Rice at the moment of the whistle, does not free the Luzerne from fault. The two-whistle signal initiated navigation before the Luzerne was pursuing a course which the Senator Rice was bound to respect, and the Luzerne undertook to then compel the Senator Rice to give way. This the Luzerne could not do.

The cases of The Chicago, 125 Fed. 712, 60 C. C. A. 480, The Cygnus, 142 Fed. 85, 73 C. C. A. 309, The New York, 175 U. S. 187, 20 Sup. Ct. 67, 44 L. Ed. 126, and subsequent cases based upon the starboard hand rule, depend upon the words printed in large type in the rule (rule 7, effective May 1, 1912), "approaching each other at right angles or obliquely so as to involve risk of collision." The former rule allowing a vessel to give a signal that it would cross the bow of the other, if this could be done without risk of collision, is no longer promulgated, but, under the special circumstance rule, the language of this old rule states what is still the law.

As in The Chicago Case, supra, crossing vessels may be proceeding at such a rate and in such positions that the burdened vessel will reach the point of intersection first. This alone does not determine the question. If the boats are within the 90-degree angle, which makes the courses "crossing," and if they would reach the point of intersection so as to get in collision, if both boats held their course and speed, then the burdened vessel must keep out of the way. This is the language of the statute of June 7, 1897 (30 Stat. 96, c. 4 [U. S. Comp. St. 1901, p. 2876]), as amended (article 19).

If the boats will clear one another, then there will be no collision, and it makes no difference which boat reaches the point of intersection of courses first, and both may hold their course and speed. If the boats be approaching the point of intersection of their courses, with an angle less than 45 degrees between their courses, one or the other of the boats will be an overtaking vessel, and the crossing rule does not apply.

The chart put in evidence and the oral testimony shows that the Luzerne was, after turning around so as to head out or up the river, either overtaking or being overtaken by the Rice, until the Luzerne reached a position where she thought she could assume a crossing course. The evidence makes it apparent that the Luzerne was never on a crossing course before the two-whistle signal by the Senator Rice. Hence she could not, by merely heading in a crossing direction or by increase of speed so as to outrun the Senator Rice, change her position from that of an overtaking or overtaken vessel to a crossing vessel, operating under a change of whistle, unless the Luzerne had first proceeded up the river far enough to have room to properly undertake a crossing course and to make the previous overtaking signal by the Senator Rice a mere incident which no longer controlled the situation. The Luzerne did not evidently reach such a position, and the two-whistle signal of the Senator Rice should have been respected. Whether the accident happened from failure so to do, or from failure to

appreciate the drift of the barges out of the line of the tug, the Luzerne must be held responsible.

The C. F. Harms Company may have a decree against the Luzerne, with costs, and the libel of the Luzerne against the Senator Rice will be dismissed, with costs. The libel of the C. F. Harms Company against the Senator Rice will be dismissed, without costs.