**THE ORANGE. Petition of RAMSDELL et al. Appeal of HUDSON NAV. CO.**

(Circuit Court of Appeals, Second Circuit. February 9, 1921.)

No. 139.

Collision ⊂⊃102—Vessels crossing; mutual faults.

> A steamer passing up Hudson river *held* in fault for collision with a crossing ferryboat for attempting to cross ahead in violation of the starboard hand rule and a signed agreement, and the ferryboat also *held* in fault for increasing her speed in violation of Inland Rules, art. 21 (Comp. St. § 7895).

Appeal from the District Court of the United States for the Southern District of New York.

Petition was filed by Henry Powell Ramsdell and others, executors, etc., as owners of the ferryboat Orange, for limitation of liability of said ferryboat for loss, damage, and injury resulting from a collision between the ferryboat Orange and the steamship Rensselaer. A decree was entered limiting the liability and holding the Rensselaer solely at fault for the collision, and restraining the claimants from further prosecuting such claims against the Orange. The Hudson Navigation Company, owner of the Rensselaer, appeals. Decree modified.

Barry, Wainwright, Thacher & Symmers, of New York City (James K. Symmers and Earle Farwell, both of New York City, of counsel), for appellant.

Duncan & Mount, of New York City (Warner C. Pyne and O. D. Duncan, both of New York City, and Thomas J. Healy, of New York City, of counsel), for appellee.

R. H. Barnett, of Newburgh, N. Y., for claimants Vonyes and Fengar.

Before WARD, ROGERS, and MANTON, Circuit Judges.

MANTON, Circuit Judge. The petitioners, as owners of the ferryboat Orange, in this proceeding in admiralty, seek to limit their liability for damages resulting from a collision between the ferryboat Orange and the steamship Rensselaer, owned by the Hudson Navigation Company, which occurred at about 10:40 p. m. on the evening of June 15, 1918, off Fifth street, Newburgh, about 400 feet off the end of the Newburgh piers. The weather was clear, and there was practically no wind; the tide was ebb. At this point the river is about one mile wide. The distance from the Orange's ferry slip at Beacon to Newburgh is a little more than one mile. The Rensselaer is a steamship plying between New York and Albany nightly, and was proceeding on one of her trips at the time. She was proceeding up the river about 800 to 1,000 feet from the Newburgh shore, and when about a mile below the point of collision she observed the ferryboat Orange leaving her slip at Beacon. The ferryboat sounded her slip whistle, and this attracted the attention of the navigator of the Rensselaer. The Rensselaer at the time was proceeding at the rate of

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

15 miles per hour, and the vessels were then about one mile apart. The Orange, after having left her slip at 10:36 p. m., as she proceeded past the long dock below her slip, sounded a slip whistle. Her navigator saw the Rensselaer after she had reached the end of the long dock, thus having a clear view down the river. The course of the Orange was then laid for a point somewhat above her slip on the Newburgh side, thus to accommodate the ebb tide.

After the Orange proceeded about a quarter of a mile across the river, and the Rensselaer was off Marvel's shipyard, signals were exchanged between both vessels. The Orange blew one whistle, and received a reply of one whistle. The Rensselaer, however, claims that she blew first, sounding a signal of two blasts, which was answered by the Orange with one blast. The Rensselaer is corroborated by the testimony of the personal injury claimants. After the exchange of whistles, the Rensselaer changed her course slightly to port and hauled in toward the Newburgh shore. The Orange rang an extra hook-up bell and increased her speed. When the position of the vessel had changed, so that the Rensselaer was above Broadway, Newburgh, and the ferryboat somewhat beyond mid-river, and about a quarter of a mile from the Newburgh shore, signals were again exchanged; the Rensselaer blowing two whistles and the Orange blowing one whistle. After this alarm whistles were blown by the Rensselaer and she stopped and backed. No alarm whistles were sounded by the ferryboat, but her engines were backed before the collision.

The evidence warrants the assertion that the Rensselaer had overcome her headway at the time of the collision. By her signal of one whistle the Orange indicated that she appreciated and knew the necessity for precaution and that necessitated signalling. Her one whistle meant that she would maintain her course and speed; but she changed her speed after giving a jingle bell, and this change admittedly made her go faster. She proceeded a quarter of a mile from the Beacon slip under ordinary full speed, and then increased her speed when she was about 25 feet away from the Rensselaer under the hook-up signal. The Rensselaer had the right to rely, to some extent, upon the Orange's signal of one whistle after she left the slip. The navigator of the Rensselaer was justified in taking this into his calculations. He then pursued the course with intent to cross the bow of the Orange. He could have, with safety, chosen a course so as to go under the stern of the Orange. But the Rensselaer could not be charged with knowledge of the hook-up bell which was sent down to the engine room of the Orange. For the Orange to increase her speed after the exchange of signals, as she did, contributed to the happening of the collision. She violated a statutory duty (section 7895, U. S. Compiled Statutes) providing that where, by any of these rules, one of two vessels is to keep out of the way, the other shall keep her course and speed, and thus cast the burden upon her of showing such violations did not and could not have contributed to the collision. The Pennsylvania, 19 Wall. (86 U. S. 125, 22 L. Ed. 148; The Delaware, 161 U. S. 459, 16 Sup. Ct. 516, 40 L. Ed. 771.

The navigator of the Orange says he saw the Rensselaer when she

was 1¼ miles south of him, at which time only her head, staff, and green lights were showing, but no red light, and in response to his first signal the Rensselaer replied with one whistle, which gave notice that the Rensselaer intended to pass under the stern in accordance with the rules of navigation; but when he blew his second whistle to the Rensselaer, he could not see her red light. This was an indication to him that the Rensselaer was not navigating in conformity to the signal, and the navigator admitted that before he blew his second whistle the Rensselaer appeared to be changing her course toward the westward. The captain of the Rensselaer confirmed this change of course, testifying that he steered closer to the Newburgh shore. If the speed of the Orange had not been increased, as it was, the collision might have been avoided. The Orange's navigator, when more than 1,000 feet from the point of collision, must have known that the Rensselaer did not intend to turn to the starboard, but, indeed, was going to port. Thus there was presented to the Orange a vessel which was disregarding signals, whose position and movements were uncertain, and she was bound to conform to the statutory rule. The night was clear, the river was free from other craft, and full opportunity was given to the Orange to navigate accordingly. We think that the Orange contributed to the bringing about of the collision by her navigation.

The court below held the Rensselaer at fault. She was at fault. The Rensselaer was the burdened vessel, and should have passed under the stern of the Orange. Her attempt to cross her bow was negligent. She saw the Orange leave her slip at Beacon, and heard the slip whistle with her pilot handling the wheel. She was going at full speed, or about 15 miles per hour. Thus proceeding up the river off the Newburgh shore, not more than 1,000 feet under full speed, she was obligated to keep out of the way of the Orange. She had been notified by signal that the Orange insisted upon her rights under the rule, and would not give way to her. She starboarded her helm, and drew in closer to Newburgh in her effort to cross the Orange's bow, in violation of the statute. She made no effort to avoid the collision until the alarm was sounded, when she reversed her engines. This conduct condemns her navigation, and makes her responsible in contributing to the collision. The Chicago, 125 Fed. 712, 60 C. C. A. 480; The Cygnus, 142 Fed. 85, 73 C. C. A. 309; The Scranton, 221 Fed. 609, 137 C. C. A. 333.

This was a fault for which there is no justification, even though there was a change in speed on the part of the Orange, as we have found.

The decree is modified, so as to hold both vessels at fault.