## THE EDWIN SLICK.

(Circuit Court of Appeals, Sixth Circuit. January 9, 1923.)

No. 3720.

I. Collision ⬦⟿35—Courses diverging 1⅞ points are crossing, not meeting "head and head."

Where two steam vessels were approaching each other in open lake on courses which diverged only 1⅞ points from directly opposite courses, which under the expert testimony and the evidence as to lights prevented those on one vessel from seeing both colored lights on the other, the vessels were not meeting "head and head," within pilot rule 5, which requires each to change its course to starboard, but were on crossing courses, within rule 10, which corresponds to White Law, rule 18 (Comp. St. § 7928), commonly called the "starboard hand rule."

⬦⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**2. Collision ⊚⇒35—Expected change of course held not to make channel rules apply.**

Where vessels were approaching on courses which made the starboard hand rule applicable, but at a point where all vessels navigating that part of the lake were accustomed to change their course, so that each might expect such a change on the part of the other, they are governed by the starboard hand rule, and not by the exception to that rule applying to vessels navigating channels which are considered as meeting head and head, regardless of their respective bearings, as they follow the turnings of the channel; the width of the navigable water at that point being 1¼ miles, so that either vessel could have kept on its course for an indefinite distance.

**3. Collision ⊚⇒39—Privileged crossing vessel held not at fault for keeping course.**

The privileged vessel on a crossing course *held* not at fault for keeping her course after exchanging one-blast signals with the approaching vessel.

Appeal from the District Court of the United States for the Eastern District of Michigan; Arthur J. Tuttle, Judge.

Libel in admiralty by the Pioneer Steamship Company against the steamer Edwin Slick, to recover damages caused by a collision. From a decree for divided damages, libelant appeals. Reversed and remanded.

L. C. Hinslea and Theo. C. Robinson, both of Cleveland, Ohio (Holding, Masten, Duncan & Leckie, of Cleveland, Ohio, on the brief), for appellant.

Harvey D. Goulder and Robert G. McCreary, both of Cleveland, Ohio (Goulder, White & Garry, of Cleveland, Ohio, on the brief), for appellee.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DENISON, Circuit Judge. In the Canadian waters of Lake Erie and in the usual course between Detroit and Cleveland, the up-bound steamer Augustus was in collision with the down-bound Slick. This libel was brought by the Augustus to recover the resulting damages. The District Court held that the greater fault was with the Slick, but that the Augustus contributed in such a degree that the damages should be divided. The Augustus appeals.

Between Point Pelee, projecting southward from Ontario, and the region of Sandusky, Ohio, there is a group of islands which obstruct any possible direct course southeastwardly from the mouth of the Detroit river. The great part of the shipping goes through the opening between Point Pelee on the north and northeast, and Pelee Island on the southwest. The customary sailing courses from Cleveland and all points further east, running westerly, converge at a point off the Southeast Shoal lightship, which is at the southern extremity of the shoal extending south from Point Pelee. These courses then all merge into one, running sufficiently north of west to clear Pelee Passage (or Middle Ground) light, which is at the northeasterly edge of the shoal water northeast of Pelee Island. Having been thus diverted somewhat northerly, the Detroit course then, as soon as it is possible

to pass Pelee Island, angles a little more to the south of west in a direct line to the mouth of the Detroit river. This region, from the Southeast Shoal lightship to the Middle Ground light, is marked on the chart as the "Pelee Passage." It is not a passage, in any strict sense. As a ship goes northwesterly, after passing the lightship, it has a mile or more of good water to the northeasterly, along Pelee Point shoal, and has the open lake at the south. The only spot in which there is much restriction upon a choice of course is northeasterly from the Middle Ground. Here is a small shoal (which must be avoided by boats of the class here involved), which is so far distant from the Middle Ground shoal that, upon the shortest line between the two, there is a mile and a half of good water. The ideal sailing course laid down upon the chart crosses this line, between Middle Ground and the outlying shoal, one mile from the former and a half mile from the latter, and at this point of crossing angles from N. W. ⅞ W. to W. N. W. ¾ W., being an angle of 1⅞ points. Immediately upon passing this point the west-bound ship has the open lake, both to the north and to the west.

Each of these boats was over 500 feet long and was making about 10 miles an hour. We adopt the story of the Augustus as to the circumstances, and we do this, not only because the Slick has not complained of the District Court's findings made on this theory, but also because the record here gives no sufficient basis for rejecting such findings, made as they were after seeing and hearing the witnesses in open court. In the early evening, after dark, but upon a clear night, the Augustus, bound up on this Pelee Passage course and distant about a mile below the charted turning point, saw the range lights of the Slick, coming down and about the same distance above the turning point. Only the green light of the Slick was visible to the Augustus. The latter ship fully understood that the Slick would, at some time and place, turn and come down the so-called Pelee Passage; but, conceiving that rule 10, hereafter quoted, was the applicable one, the Augustus blew a one-blast signal and kept her course and speed, and the Slick answered with one blast and also made no change in course or speed. After going half a mile, the Augustus, in order to be sure that there was no misunderstanding as to the meeting agreement, repeated the one-blast signal, which the Slick again promptly answered, and both boats continued without change until they were within three or four boat lengths of each other and danger was evident. The Slick had been constantly bearing at about two points on the port bow of the Augustus. There was, in the judgment of the Augustus' captain, still opportunity to make the port to port meeting, if both boats yielded, and accordingly he blew an alarm, intending to follow it with a repetition of the one-blast signal, and ordered his helm to be ported; but immediately upon the alarm the Slick blew two blasts, accompanying it with a starboarded helm, and before the port helm of the Augustus had taken any effect the order was countermanded and the helm put hard astarboard, and the bow of each boat fell away to port so that the bows cleared each other; but this threw the stern of the Slick to starboard, and the bluff of the

bow of the Augustus struck the Slick a short distance abaft the beam. Neither boat was sufficiently injured to prevent continuing the trip.

Both parties agree that, though the boats were temporarily in Canadian waters, the situation is to be governed by the so-called White Law—the Act of February 8, 1895 (Comp. St. §§ 7910–7941)—and by the pilot rules for the waters of the Great Lakes, adopted pursuant to this act by the board of supervising inspectors in January, 1912. We proceed upon the theory so accepted. The controversy which arises is as to whether these two boats should be considered as meeting "head and head or nearly so," or as approaching each other "obliquely so as to involve risk of collision." Referring to the pilot rules, those applicable seem to be as follows:

Rule I: "In all weathers every steam vessel under way in taking any course authorized or required by these rules shall indicate that course by the following SIGNALS on her whistle, to be accompanied, whenever required, by corresponding alteration of her helm; and every steam vessel receiving a signal from another shall promptly respond with the same signal or sound the danger signal as provided in rule II:

"*One blast* means, 'I am directing my course to starboard,' except, when two steamers are approaching each other at right angles or obliquely, other than when one steamer is overtaking another, one short blast signifies intention of steamer which is to starboard of the other to hold course and speed.

"*Two blasts* means, 'I am directing my course to port.'"

Rule V: "When steamers are APPROACHING EACH OTHER 'HEAD AND HEAD,' OR NEARLY SO, it shall be the duty of each steamer to pass on the port side of the other; and the pilot of either steamer may be first in determining to pursue this course, and thereupon shall give as a signal of his intention, one short and distinct blast of his whistle, which the pilot of the other steamer shall answer promptly by a similar blast of his whistle, and thereupon such steamers shall pass on the port side of each other. * * * In the night, steamers will be considered as meeting 'head and head,' so long as both the colored lights of each are in view of the other."

Rule X. "When two steamers are APPROACHING EACH OTHER AT RIGHT ANGLES OR OBLIQUELY SO AS TO INVOLVE RISK OF COLLISION, other than when one steamer is overtaking another, the steamer which has the other on her port side shall hold her course and speed; and the steamer which has the other on her starboard side shall keep out of the way of the other by directing her course to starboard so as to cross the stern of the other steamer, or, if necessary to do so, slacken her speed or stop or reverse. The steamer having the other on her own port bow shall blow one blast of her whistle as a signal of her intention to cross the bow of the other, holding her course and speed, which signal shall be promptly answered by the other steamer by one short blast of her whistle as a signal of her intention to direct her course to starboard so as to cross the stern of the other steamer or otherwise keep clear."

Rule XII. "In obeying and construing these rules due regard shall be had to all DANGERS OF NAVIGATION AND COLLISION and to any SPECIAL CIRCUMSTANCES which may render a departure from the above rules necessary in order to avoid immediate danger."

The corresponding provisions of the White Law, so far as they are applicable, being rules 17, 18, 20, and 23, do not seem to be materially variant from the pilot rules. White Law, rule 18, corresponding to pilot rule 10, is so phrased that it is commonly called the "starboard hand rule." Hereafter our references are to the pilot rules.

From these rules it is apparent that, if the Augustus and the Slick were to be considered as meeting end on, or "head and head, or nearly so," when they had exchanged the one-blast signals, it was the

duty of each vessel to direct her course to starboard, and each was equally burdened with the duty of keeping away, while, if they were to be considered as meeting "obliquely, so as to involve a risk of collision," and they had exchanged the same passing signals, it was the duty of the Augustus to make no change in her course, and she became the privileged vessel, while it was the duty of the Slick to turn to starboard and keep clear.

[1] The rules prescribe their own definitions for "head and head" and "risk of collision." Steamers are not to be considered as meeting head and head unless both the colored lights of each are in view of the other, and (by the clause preliminary to the rules) the risk of collision exists if the bearing of the approaching vessel does not appreciably change as the approach continues. Under both of these definitions, it is rule 10, and not rule 5, which is applicable, where vessels approach each other as these did.

It seems to be the expert opinion that, when lights are properly screened, both lights are visible ahead over an arc of not more than one point and perhaps not more than half a point. If the screening were theoretically perfect, there would be no point where both lights were visible; indeed, there would be a dark zone as wide as the boat where neither light could be seen; but, owing perhaps to the necessary size of an efficient light-giving body, there is in practice enough leakage across the bow to bring the result above stated. It follows that, where each boat sees only one light of the other, and the lights are properly screened, and the bearings of the boats to each other continue constant, they are approaching "obliquely, so as to involve risk of collision."

[2] The controversy in this case probably would not have arisen, excepting as these rules and their application are complicated by the fully expected change of course of each boat in the vicinity of the point of anticipated meeting. Although it has not been formulated in the pilot rules or in the White Law, it is well settled that in narrow and winding channels, where each boat knows that the other must make prescribed turns at fairly definite points, and that, whenever they do meet, their courses will be approximately parallel, they are to be considered as meeting head on, and each boat has an equal duty to yield to the starboard. The District Judge concluded that the meeting of these boats was to be governed by this channel rule. It undoubtedly carries some aspects of that situation; and if the expected meeting point—the neck of the bottle—was narrow enough and long enough, so that the point of turning would be limited to a relatively small area, as it would be in a channel or opening of say 1,500 feet in width and of substantial length, we assume that these aspects would dominate.

[3] We are compelled to think that the situation here present is more characteristic of an open lake meeting. As to the point of crossing this line of greatest constriction, the navigators had a freedom of choice extending to a mile and a half, and, as to the point of turning, there was unlimited freedom. The Slick could have continued on her course 3 miles past the theoretical turning point before getting in-

to shoal water, and without losing much distance, while the Augustus could have kept her course beyond the same theoretical point for many miles. We therefore must conclude that the Augustus was under no duty to yield to starboard, and was not at fault.

There is no sufficient reason for thinking that the Augustus was not far enough away from the Pelee Island shoal on her port, so that there was ample room for the Slick to come down between. If the contrary were the fact, there would be a different situation, though it would seem that in such a case the burdened vessel should either decline the agreement and blow an alarm, or, if accepting, should delay long enough to insure her own safety. However, such a case is not before us.

In the precise proportions in which the symptoms which indicate treatment under rule 5 are combined with those which invoke rule 10, this case seems to be unique. Perhaps the closest authoritative decision on its facts is The Delaware, 161 U. S. 459, 16 Sup. Ct. 516, 40 L. Ed. 771. The Delaware was entering New York harbor through a dredged channel 1,100 feet wide and marked on both sides by buoys; the Talisman (probably of lighter draft) was entering the channel on the Delaware's starboard bow and about at right angles; the Talisman was bound for the outer end of the channel, and apparently intended to turn and go out, so that, if the turn had been made in time, the boats would have met on parallel courses in the channel. Each boat kept its own course until the collision. The Supreme Court held that, not the head on rule, but the crossing rule, applied; that the Talisman was under no duty to port and was not at fault. The court says (161 U. S. 467, 16 Sup. Ct. 520, 40 L. Ed. 771):

"If [the rules] were so construed as to require the preferred vessel to port, after having blown a blast of her whistle, it would involve a violation of article 23 [rule 10] which requires her to keep her course. * * * Certainly the rules should not be construed to require the steamer giving the signal to violate a plain statutory rule of navigation."

The situation in The Delaware seemed to appeal for relaxation of the crossing rule in favor of the head-on rule more forcefully than the facts here would call for a similar relaxation. The Delaware had only the remaining width of the channel—if she was in the center then only 500 feet—within which she could yield to aid in passing under the stern of the Talisman; the Slick had about a mile of room for this maneuver.

The Victory and Plymothian, 168 U. S., 410, 18 Sup. Ct. 149, 42 L. Ed. 519, is the leading case declining to extend the starboard hand rule to every case within its letter. There the vessels were sailing in opposite directions upon the Elizabeth river. It was held that the starboard hand rule did not apply, although in the beginning the Plymothian had the Victory on her starboard bow and would have been the burdened vessel under this rule; but it was clear that the Plymothian must go around the bend before the vessels met, and that the meeting would be head on. It may be noted that it was not very important whether the starboard hand rule did apply, because the

Plymothian did everything which could rightly have been required of it under that rule.

There have been two cases in this circuit on which the Slick relies to justify dependence on the head-on rule. The first was The Waldo, 100 Fed. 502, 40 C. C. A. 517. This case arose out of a collision in St. Mary's river, and it was clear that rule 10 did not apply, because the case was governed by an express proviso in rule 5, referring not only to narrow channels but to St. Mary's river by name. The other one arose at the mouth of the Detroit river, and while the collision occurred well away from any land, yet the case (Lake Erie Co. v. Gilchrist, 142 Fed. 89, 73 C. C. A. 313) was clearly controlled by the narrow and winding channel principle. A dredged channel extended southerly from the mouth of the river, and this channel was used by all the traffic. At a relatively fixed point, all down-bound traffic turned to port out of this channel, and all up-bound traffic turned to starboard and swung into it. The turning point was rather definitely fixed. The up-bound boats could not overrun it, because of the westerly channel bank, and the down-bound boats also must turn there, or get out of the channel into unaccustomed and doubtful water. The case was therefore in principle the same as if it had arisen at a bend in a river. The compulsory nature of the turn, and therefore its definite anticipation by both boats, were only less in degree than if in a river. The case is well distinguished from the present one because we find there a long narrow dredged channel a few hundred feet wide, and here a single point of constriction between headland points a mile and a half apart, and because there the turning point was marked on three sides and here it was to be selected by the navigator within wide limits of choice. The opening, or width of the channel, as it turned east, was 2,800 feet and both sides were marked. The court considered the case as one of a definite channel having a right-angled turn.

An often quoted extract from the opinion in The Victory and Plymothian is urged in support of the claim that these vessels were meeting head and head because their courses did not diverge more than two points. It is (168 U. S. 418, 18 Sup. Ct. 153, 42 L. Ed. 519):

"It has often been held as a general rule of navigation that vessels approaching each other in narrow channels, or where their courses diverge as much as 1½ or 2 points, are bound to keep to port and pass to the right, whatever the occasional effect of the sinuosities of the channel."

These exact words, literally construed, are broad enough to reach vessels approaching each other in the open sea; but we do not think they are so intended or should be so accepted. Not only would the meaning be contradictory of the undisputed rule that vessels approaching from opposite directions in open water may pass on either side, depending upon their respective locations, but the whole statement must be intended to refer only to meetings in narrow channels. There is obvious confusion in the language. If it applied to open water, with the meaning now claimed, the language would have been "where their courses diverged *no more than* 1½ or 2 points" instead of "as much as." The duty which is intended to be stated doubtless is "to

keep to the right and pass to port," instead of, as the court is made to say, "to keep to port and pass to the right." If we may substitute "even" for "or," the construction and meaning become clear. Each one of the cases cited referred to a channel meeting, and the last clause of the extract makes it clear that the court was not intending to speak of vessels approaching anywhere excepting in channels, which might have sinuosities.

It may be true that it would have done no harm for the Augustus to have swung out to starboard upon giving the first or even the second signal, but no one can be sure about that. Such a maneuver would have given the Slick more room and more time in which to make the turn, but if she had kept on as she did without turning, the collision might not have been avoided. However, that might be, the obligation of the Augustus to keep her course was just as absolute and that of the Slick to keep away. If the Augustus had gone to starboard, it would have been at the risk of being held in fault for any bad results that might have happened. The navigator of the Slick was entitled to depend absolutely upon the expectation that the Augustus would keep her course, and, up to the time when an emergency had developed, he could have complained of any porting by the Augustus.

The Circuit Court of Appeals of the Second Circuit in The Chicago, 125 Fed. 712, 717, 60 C. C. A. 480, 485, said:

"It was pointed out in The Britannia, 153 U. S. 138, 14 Sup. Ct. 795, 38 L. Ed. 660, that the navigators of privileged vessels should not be too quick in assuming that burdened vessels are not going to yield to them, although their behavior may be erratic. * * * 'Special circumstances' will sometimes render a departure from the rules necessary, but unless the navigator of a privileged vessel acts on the assumption that both vessels are going to obey the rules, until he is advised to the contrary, his nervous vacillation will often precipitate the catastrophe the rules were devised to avoid."

Again it is said in The Delaware, supra, 161 U. S. at page 469, 16 Sup. Ct. 521, 40 L. Ed. 771:

"If the master of the preferred steamer were at liberty to speculate upon the possibility, or even the probability, of the approaching steamer failing to do her duty and keep out of his way, the certainty that the former will hold his course, upon which the latter has a right to rely, and which it is the very object of the rule to insure, would give place to doubts on the part of the master of the obligated steamer as to whether he would do so or not, and produce a timidity and feebleness of action on the part of both, which would bring about more collisions than it would prevent."

Again in The Cygnus, 142 Fed. 85, 88, 73 C. C. A. 309, 312, the Circuit Court of Appeals of the Second Circuit said:

"The Dimock was in the situation in which so many other privileged vessels have been put by gross disregard of the obligation laid upon a burdened vessel, where one cannot tell at what moment of time the other vessel will conform to the rules, and where an effort to save catastrophe by altering course or changing speed may coincide precisely in time with some change by the other boat, and thus precipitate the disaster, instead of avoiding it."

The record contains some evidence that vessels, meeting at about this point, sometimes or often meet under a two-blast agreement; and this is said to show that it is the custom to regard rule 5 as the applicable one. Passing by the insufficiency of any custom to vary a

definite statutory rule, we draw no such broad inference from this testimony. In many cases of approach to this turning point, it will be sufficiently evident that there is no risk of collision upon converging courses, but that one or the other of the boats will naturally have the turn completed and be steadied upon the new course before the meeting occurs. In such cases, an agreement to pass starboard to starboard, with appropriate yielding by each, may be natural, and, if the boats join in such an agreement, they have eliminated the starboard hand rule. Not so when they meet under the one-blast agreement, which is as appropriate to the rule which the law applies, rule 10, as it is to rule 5, which they might substitute if they wished. The common agreement to substitute contract rights for statutory cannot be inferred from signals which are just as appropriate if there is no thought of substitution.

The Slick also insists that the master of the Augustus, observing that the Slick was keeping her course, should have inferred much earlier than he did that there would be trouble and have taken some emergency precaution. The evidence does not justify this conclusion. Meetings with a clearance of only 100 or 200 feet seem to be considered as safe enough, and the slight turn which would be necessary by the Slick, and the quickness with which it could be made, we think justify the master of the Augustus in continuing to rely upon an expected observance of the rule until about the time when he did blow his alarm.

We conclude that, so far as the decree holds the Augustus in contributory fault, it must be reversed, and the record will be remanded for further proceedings in accordance with this opinion.